1  Mitchell Posin, Esq.
Law Offices of Mitchell Posin, Chtd.
2  1645 Village Center Circle, Suite 200
Las Vegas, Nevada 89101
3  Tel. (702) 382-2222/Fax (702) 382-7496
mposin@gmail.com
4  Attorney for Plaintiff and proposed attorney for Class of Injured Property Owners

5

6  **UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

7  MICHAEL HARKEY
        Plaintiff and Proposed Lead Class
8        Plaintiff for All Nevada Property
        Owners Similarly Situated,
9        who were deprived of their
        right to petition the judiciary          Case No.  2:14-cv-00177-MMD-GWF
10        for redress of grievances by
        the use of fraudulent recorded          **FIRST AMENDED COMPLAINT**
11        documents by the MERS                  **JURY TRIAL DEMANDED**
        ENTERPRISE described herein
12  vs.

13  US BANK, N.A., AS TRUSTEE FOR
THE CSMC MORTGAGE-BACKED
14  TRUST 2007-6; CSMC
MORTGAGE-BACKED TRUST
15  2007-6; CREDIT SUISSE FIRST
BOSTON MORTGAGE SECURITIES
16  CORPORATION; DLJ MORTGAGE
CAPITAL, INC.; SELECT
17  PORTFOLIO SERVICING, INC.;
WELLS FARGO BANK, N.A.;
18  MERSCORP HOLDINGS, INC.;
MORTGAGE ELECTRONIC
19  REGISTRATION SYSTEMS, INC.;
QUALITY LOAN SERVICE
20  CORPORATION; BLACK KNIGHT
FINANCIAL SERVICES, LLC formerly
21  known as LENDER PROCESSING
SERVICES, INC.; FIDELITY NATIONAL
22  FINANCIAL,  INC.;  JESSIE BEWLEY;
JOSEPH NOEL; CHRISTINA ALLEN;
23  SHOUA MOUA; BILL KOCH;
KIMBERLY CLARK; VANESSA
24  GONZALES; MICHELLE NGUYEN;
SAFEGUARD PROPERTIES, LLC;
25  ADAM FENN: EARL BEUTLER: EVE
BEUTLER; DOES I-XX and ROE
26  CORPORATIONS I-XX, inclusive
Defendants.

27

28                                      1

**FIRST AMENDED COMPLAINT**

COMES NOW, MICHAEL HARKEY, by his attorney, Mitchell Posin of the Law Office of Mitchell Posin, Chtd. and for his claim against Defendants states and alleges as follows:

**PARTIES**

1. Plaintiff, MICHAEL HARKEY, hereinafter HARKEY or PLAINTIFF, was at all times relevant hereto a resident of the County of Clark, State of Nevada, and is the lawful record owner of 2220 Village Walk Drive, Unit 3315, Henderson, Nevada 89052 under the Deed of Trust (DOT) attached hereto as Exhibit 1, whose personal and property rights were violated by the acts complained of herein.

2. All acts complained of herein took place in the County of Clark, State of Nevada.

3. Defendant US BANK, N.A. (hereinafter US BANK) is a national banking association, organized under 12 USC sec. 21, et seq., with its headquarters located at 80 South 8th Street, #224, Minneapolis, Minnesota 55402 and is purported to be the Trustee of the CSMC MORTGAGE-BACKED TRUST 2007-6.

4. Defendant CSMC MORTGAGE-BACKED TRUST 2007-6 (hereinafter the TRUST) is a purported Real Estate Mortgage Investment Conduit (REMIC) Trust purportedly operating pursuant to New York Trust Law; it is not registered to do business in the State of Nevada and, therefore, it is not entitled to the benefit of the Nevada Statutes of Limitation as to any state law cause of action pleaded herein pursuant to NRS sec. 80.090; it was created by CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORPORATION, and, upon information and belief, CREDIT SUISSE AG, is a banking corporation organized under the laws of Switzerland, with its headquarters located in Zurich, Switzerland.

5. Defendant CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORPORATION (hereinafter CSFBMS) is a corporation organized under the laws of the State of Delaware; it is not registered to do business in the State of Nevada and is, therefore, not entitled to the benefit of the Nevada Statutes of Limitation as to any state law cause of action

pleaded herein pursuant to NRS 80.090; upon information and belief, it is a subsidiary of CREDIT SUISSE AG, a banking corporation organized under the laws of Switzerland, with its headquarters located in Zurich, Switzerland; and it is the "depositor" under the Pooling and Servicing Agreement (hereinafter PSA) for the TRUST.

6. Defendant DLJ MORTGAGE CAPITAL, INC. (hereinafter DLJMC) is a Delaware corporation; it is not registered to do business in the State of Nevada and is, therefore, is not entitled to the benefit of the Nevada Statutes of Limitation as to any state law cause of action pleaded herein pursuant to NRS 80.090; and, upon information and belief, it is a subsidiary of CREDIT SUISSE AG, a banking corporation organized under the laws of Switzerland, with its headquarters located in Zurich, Switzerland; and it is the seller of the securities offered under the TRUST prospectus and is believed to have sponsored the securities offering.

7. Defendant SELECT PORTFOLIO SERVICING, INC. (hereinafter SPS) is a corporation organized under the laws of the State of Utah; it is registered to do business in the State of Nevada; and, upon information and belief, it is a subsidiary of CREDIT SUISSE AG, a banking corporation organized under the laws of Switzerland, with its headquarters located in Zurich, Switzerland.

8. Defendant WELLS FARGO BANK, N.A. (hereinafter WELLS FARGO) is a national banking association, organized under 12 USC sec. 21, et seq., with its headquarters located at 420 Montgomery Street, San Francisco, California 94163 is purported to be the Master Servicer and Administrator of the CSMC MORTGAGE-BACKED TRUST 2007-6.

9. Defendant MERSCORP HOLDINGS, INC. (hereinafter MERSCORP) is a corporation organized under the laws of the State of Delaware; upon information and belief, is the parent company of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. in its third iteration (MERS III as described in paragraph 10, below); it is not registered to do business in the State of Nevada and is, therefore, not entitled to the benefit of the Nevada Statutes of Limitation as to any state law cause of action pleaded herein pursuant to NRS 80.090.

10. Defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (hereinafter MERS) is a corporation organized under the law of the State of Delaware and is the third entity bearing the name MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. and the history of the use of the name "Mortgage Electronic Registration Systems, Inc." is set forth below:

a. The first entity organized as MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (MERS I) in October of 1995 (Delaware Division of Corporations File No. 2543543) and its service mark was registered with 1995 (Delaware Division of Corporations File No. 2543543.)

b. On June 30, 1998, "MERS I," created a new company named NEW MERS Inc., and merged itself with this new company, but retained the name as Mortgage Electronic Registration Systems, Inc. (MERS II.)

c. Later that year, in December of 1998, MERS II, filed a Certificate of Amendment with the State of Delaware to change its name to MERSCORP, Inc.

d. In 1999, the following year, MERSCORP, Inc. created yet another company known as "Mortgage Electronic Registration System, Inc." (MERS III) under Delaware Division of Corporations File No. 2990193.

e. MERS is not registered to do business in the State of Nevada and is not entitled to the benefit of the Nevada Statutes of Limitation as to any state law cause of action pleaded herein pursuant to NRS 80.090.

11. Defendant QUALITY LOAN SERVICE CORPORATION (QLSC) is a corporation organized under the laws of the State of California and is registered to do business in the State of Nevada.

12. Defendant BLACK KNIGHT FINANCIAL SERVICES, LLC (hereinafter LPS), formerly known as LENDER PROCESSING SERVICES, INC. (hereinafter LPS), is a Delaware corporation; is a subsidiary of FIDELITY NATIONAL FINANCIAL, INC. (hereinafter FNF), a

Delaware corporation; it is not registered to do business in the State of Nevada and is, therefore, not entitled to the benefit of the Nevada Statutes of Limitation as to any state law cause of action pleaded herein pursuant to NRS 80.090.

13. Defendant FIDELITY NATIONAL FINANCIAL, INC. (FNF), is a Delaware corporation of which, upon information and belief,  FIS DEFAULT SOLUTIONS, is a division; FNF it is not registered to do business in the State of Nevada and is, therefore, not entitled to the benefit of the Nevada Statutes of Limitation as to any state law cause of action pleaded herein pursuant to NRS 80.090; it used LPS employees to sign and execute documents purporting to convey interests in real estate in the State of Nevada.

14. Defendant JESSE BEWLEY (hereinafter BEWLEY), is, upon information and belief, an adult resident of the State of Nevada, who was employed by LENDER PROCESSING SERVICES, INC. (hereinafter LPS) now known as BLACK KNIGHT FINANCIAL SERVICES, LLC (hereinafter LPS) and signed the Notice of Default (NOD) attached hereto as Exhibit 2 for FIS DEFAULT SOLUTIONS, a division of FNF, in the purported capacity of agent for QLSC, as agent for the beneficiary of the DOT, which was purportedly MERS, as nominee of NEW CENTURY MORTGAGE CORPORATION (NCMC), in violation of NRS 205.377 and NRS 205.395 with the intent to defraud HARKEY.

15.  Defendant JOSEPH NOEL (hereinafter NOEL) is, upon information and belief, an adult resident of the State of Nevada, who notarized documents for LPS and was instructed to notarize documents before they were signed by the person whose signature was being verified by the notary execution, according to his admissions in Grand Jury proceedings conducted by the Office of the Attorney General for the State of Nevada on November 15, 2011 in violation of NRS 205.377 and NRS 205.395 with the intent to defraud HARKEY. (See Exhibit 3 attached hereto: Partial Transcript of the Grand Jury Testimony of NOEL regarding LPS, Day 2, November 15, 2011, pages71-79.)

16.  Defendant CHRISTINA ALLEN (hereinafter ALLEN) is, upon information and

belief, an adult resident of the State of Minnesota, who was employed by LPS to sign documents, including but not limited to Exhibit 4, which purport to convey interests in real estate regardless of the true chain of title to those interests, without personal knowledge of the essential facts required for the execution of such documents; Exhibit 4 is outside the chain of title because there is no conveyance of record prior to the execution of the Substitution of Trustee to establish the rights of "U.S. Bank National Association, as trustee, on behalf of the holders of the CSMC Mortgage-Backed Pass-Through Certificates, Series 2007-6 by Select Portfolio Servicing, Inc., its Attorney in Fact" either as to US BANK as beneficiary of the DOT or SPS as its Attorney in Fact, in violation of NRS 205.377 and NRS 205.395 with the intent to defraud HARKEY.

17.  Defendant SHOUA MOUA (hereinafter MOUA) is, upon information and belief, an adult resident of the State of Minnesota and was employed by LPS to execute documents as a notary public, pretending to have verified the capacity of the signers of documents, such as ALLEN on Exhibit 4, when she knew or should have known that ALLEN was employed by LPS and not SPS and the notarized document was executed with the intent to defraud HARKEY, in violation of NRS 205.377 and NRS 205.395.

18.  Defendant BILL KOCH (hereinafter KOCH) is, upon information and belief, an adult resident of the State of Utah, KOCH was employed by SPS when he executed the "Corporation Assignment of Deed of Trust" (attached Exhibit 5, dated July 18, 2008, purportedly signed on July 28, 2008 in the presence of notary KIMBERLY CLARK on July 28, 2018); he knew or should have known that he was not an Assistant Secretary of MERS, being an employee in fact of SPS; knew or should have known that NCMC had been in bankruptcy proceedings since April 2, 2007 in the United States District Court for the District of Delaware in Case No. 07-10419 (KJC) (consolidated in main case caption New Century TR Holdings, Inc., Case No. 07-10416(KJC) April 2, 2007 (judicial notice requested) and MERS was, therefore, incapable of alienating its assets without an Order of the Bankruptcy Court; and KOCH signed Exhibit 5 in violation of NRS 205.377 and NRS 205.395 with the intent to defraud HARKEY.

19. Defendant KIMBERLY CLARK (hereinafter CLARK) is, upon information and belief, an adult resident of the State of Utah and was employed by SPS when she notarized the "Corporation Assignment of Deed of Trust," when she knew or should have known that KOCH was not an Assistant Secretary of MERS, since both CLARK and KOCH were employed by SPS, and she notarized Exhibit 5 in violation of NRS 205.377 and NRS 205.395 with the intent that it should be accepted for recording by the Clark County Recorder in order to defraud HARKEY.

20. Upon information and belief, Defendant VANESSA GONZALES (hereinafter GONZALES) was an adult resident of the State of California and was employed by QLSC when she signed Exhibit 6 (the Trustee's Deed Upon Sale); in her capacity as purported Assistant Secretary of QLSC, when she knew or should have known that QLSC was not authorized to issue the Trustee's Deed Upon Sale because QLSC was not lawfully substituted as Trustee of the DOT; and she signed Exhibit 6 in violation of NRS 205.377 and NRS 205.395 with the intent to defraud HARKEY.

21. Upon information and belief, Defendant MICHELLE NGUYEN (hereinafter NGUYEN), was an adult resident of the State of California and was employed by QLSC when she notarized the signature of GONZALES on Exhibit 6 (the Trustee's Deed Upon Sale) in her capacity as purported Assistant Secretary of QLSC, when she knew or should have known that QLSC was engaged in the pattern and practice of falsely claiming to be the lawful substitute trustee on Deeds of Trust and knowingly or recklessly notarized GONZALES' signature with the intent to defraud HARKEY in violation of NRS 205.377 and NRS 205.395.

22. SAFEGUARD PROPERTIES, LLC (hereinafter SAFEGUARD) is a corporation organized under the laws of the State of Delaware and is registered to do business in the State of Nevada; it operates a scheme to "trash out" residences which have purportedly been foreclosed; SAFEGUARD is known to use unreliable persons as its agents to engage in the "trash out" projects and to break and enter into residences, even residences which have not been foreclosed or have been unlawfully foreclosed, which intimidates homeowners who are defending against

1   foreclosures; it is even known to have broken into and entered into residences which are not in

2   foreclosure; its unreliable agents are known to take the personal property of persons from their

3   residences with the intent to deprive them permanently of possession of their personal property;

4   its agents took HARKEY's valuable personal property; SAFEGUARD, through an agent calling

5   herself Susan Morgan promised to return HARKEY's personal property and requested a list of

6   the property which had been removed by SAFEGUARD; when the list of property was prepared

7   and submitted, through HARKEY's counsel, SAFEGUARD then claimed that it had no person

8   named Susan Morgan working for it and stated that it takes all property removed from residences

9   to the city dump; HARKEY's neighbors informed him that when his personal property, including

10  an entire household of furnishings and belongings, was being removed, it was professionally

11  wrapped and he knows that his personal property, which consisted of valuable furnishings, art

12  work and collectibles, as well as important papers and family memorabilia was not all taken to

13  the city dump.

14      23.  ADAM FENN (hereinafter FENN) is an adult resident of the State of Nevada, who

15  is, upon information and belief, a licensed real estate agent, and who acted as the selling agent for

16  US BANK, as purported Trustee of the TRUST after it took title to HARKEY's real estate on

17  fabricated documents and, upon information and belief, FENN was instructed by US BANK to

18  obtain the services of SAFEGUARD to remove HARKEY's personal property from the subject

19  premises and did so in conscious disregard of HARKEY's property rights, when he knew or

20  should have known that had the right to the personal property which was located on the subject

21  premises.

22      24. EARL and EVE BEUTLER (hereinafter the BEUTLERS) purchased the subject

23  premises for less than fair value, knowing that HARKEY had a claim to title to the subject

24  premises and are not bona fide purchasers, in good faith and for value, without notice of

25  HARKEY's claimed ownership of the subject premises; the BEUTLERS have been receiving

26  rents from the subject premises in the amount of $2,500.00 per month since they acquired the

27

28                                                                  8

subject premises to which HARKEY has superior title as will be shown herein in October, 2010 and must be required to disgorge their profits from the rental of the premises and must be ordered to surrender possession thereof to HARKEY.

25. DOES I-XX are individuals whose identities are yet to be discovered and who participated in the acts complained of herein and are jointly and severally liable with the named Defendants as to some or all of the causes of action set forth herein.

26. ROE CORPORATIONS I-XX are entities formed under the laws of any of the several states the identities of which are yet to be discovered and which participated in the acts complained of herein.

27. MICHAEL HARKEY, is presently unable to identify certain additional participants in the acts complained of herein so as to join them in their true names and capacities and presently identifies such unknown Defendants to be sued herein as DOES I through XX, and ROE CORPORATIONS I through XX, inclusive, and therefore sues these Defendants by such fictitious names.

28. PLAINTIFF is further informed and believes that one or more of the parties which may be responsible for some portion of the damages being sought by PLAINTIFF may include persons, partnerships, corporations and/or other entities, the identities of which have not yet been determined. Because such names are currently unknown, PLAINTIFF has listed them collectively as DOE Defendants and ROE CORPORATION Defendants and will seek leave of Court to amend this Complaint to allege their true names and capacities when they have been ascertained.

29. PLAINTIFF is informed and believes, and thereon alleges, that each of the unnamed individuals and entities presently joined under fictitious names as Defendants herein may be responsible in some manner for the occurrences described herein and that his damages were proximately caused by such conduct and that such presently unidentified individuals and entities may be jointly and severally liable with named Defendants for the PLAINTIFF'S damages.

**RESERVATION OF RIGHTS TO AMEND AND SUPPLEMENT**

30. PLAINTIFF does not presently plead his private cause of action allowed under NRS 205.395 and reserves his rights to supplement this FIRST AMENDED COMPLAINT or, in the alternative, to seek leave to amend this FIRST AMENDED COMPLAINT to include the cause of action arising thereunder if the Defendants which have violated NRS 205.395 by failing to correct the documents signed, executed and recorded in violation thereof within 20 days after service of the written request for correction under NRS 205.395(5).

## JURISDICTION AND VENUE

31. This Court has jurisdiction over this Complaint under 28 USC sec. 1331 because it pleads violations of 18 USC sec. 1961, et seq. and 42 USC secs. 1983 and 1985; it has jurisdiction over the alleged violation of the automatic stay in HARKEY's bankruptcy case under 28 USC sec. 1334 and supplemental jurisdiction over the pendent state claims pursuant to 28 USC sec. 1367; this Court has jurisdiction to provide the declaratory relief under 28 USC secs. 2201 and 2202.

32. Venue in this district is proper under 28 USC sec. 1391(b)(1) because two of the Defendants are residents of this district and under 28 USC sec. 1391(b)(2) because the substantial part of the events or omissions giving rise to the claim occurred in this district and the property that is the subject of the action is situated in this district.

## FACTS COMMON TO ALL CAUSES OF ACTION

33. Plaintiff is last record owner of property located at: 2220 Village Walk Drive, Unit 3315, Henderson, Nevada (hereafter called "subject property"), pursuant to a Deed of Trust (DOT) dated February 6, 2007 in favor of Defendant New Century Mortgage Corporation (NCMC) and recorded with the Clark County Recorder prior to the tortious misconduct described herein.

34. On April 2, 2007, NCMC filed for Bankruptcy protection in the United States Bankruptcy Court for the District of Delaware in Case No. 07-10419(KJC), which was administratively consolidated into the lead case filed by New Century TR Holdings as Delaware

Bankruptcy Case No. 07-10416(KJC).

35. HARKEY requests that this Court take judicial notice of the bankruptcy filing of NCMC on April 2, 2007 as Case No. 07-10419, its consolidation into Case No. 07-10416 and Judge Carey's Order Confirming the Second Amended Plan of Reorganization *In re: New Century TR Holdings Inc.* (and its affiliates, including NCMC) Case No. 07-10416(KJC) (Docs. 8596, 8956-1 and 8956-2 in those proceedings) by which all assets of NCMC were deemed to have been transferred and conveyed into the New Century Liquidating Trust effective July 15, 2008.

36.   On July 28, 2008, KOCH, an employee of SPS, purported to substitute QLSC as Trustee of HARKEY's DOT, which CLARK notarized as verifying KOCH's authority as Assistant Secretary of MERS as nominee for NEW CENTURY MORTGAGE CORPORATION, when NCMC could not, on July 28, 2008, have held any interest in the DOT, all of its assets having been conveyed to the New Century Liquidating Trust on July 15, 2008 and all assets having been conveyed into the Chapter 11 estate on April 2, 2007.

37. MERSCORP is the entity which operates the MERS® computer data base and purported to authortize entities which paid a fee to be "members" of MERSCORP to use the name of its subsidiary, Mortgage Electronic Registration Systems, Inc., on mortgages and Deeds of Trust (DOTs) and established and published policies which changed from authorizing foreclosures to be conducted in the name of Mortgage Electronic Registration Systems, Inc. until July, 2011, then instructed that only the Note holder or its servicer should commence foreclosures between July, 2011 and February, 2012 and thereafter removed all public access to its policies and procedures after the March, 2012 oral argument before the Washington Supreme Court on certified questions from the United States District Court for the Western District of Washington in *Bain v. Metropolitan Mortgage Group, Inc.*, *et al.,* Case No. No. 86206-1, consolidated with No. 86207-9, for which HARKEY seeks Judicial Notice and which may be viewed at http://www.tvw.org/index.php?option=com_tvwplayer&eventID=2012030003A.

38.   The March 15, 2012 oral argument by counsel, Robert Pratte of Minnesota, pro hac vice, who purported to represent Mortgage Electronic Registration Systems, Inc. before the Washington Supreme Court at the oral argument in *Bain*, supra, revealed the MERS® system operations for their true purpose and result: the deliberate concealment of the identity of the entities which hold the Notes secured by mortgages and DOTs  from the homeowners, their counsel, and the Courts of the real parties and Pratte stated that homeowners need only know who services their mortgages and argued that Mortgage Electronic Registration Systems, Inc. should be allowed to seek nonjudicial foreclosure in its own name.

39.   The Washington Supreme Court did not accept the position taken by Attorney Pratte and held, on August 16, 2012, in *Bain v. Metropolitan Mortgage Group, Inc., et al.,* 175 Wn.2d 83, 285 P.3d 34 (2012) that only the Note holder may pursue the remedy of nonjudicial foreclosure in the State of Washington.

40.   MERSCORP, which owns the private computer data base known as MERS®,  fails to verify the continuing existence of entities, who are named as it members, and in whose name it permits and instructs the fabrication of documents, resulting in the fraudulent recordation of documents assigned without authority from nonexistent and bankrupt entities which have no existence or authority to assign mortgages and DOTs, as occurred in the instant case.

41.   The MERS® system requires the creation and recordation of fictitious documents, which defrauded thousands of Nevada homeowners, their counsel, the Court and the public records by flooding the offices of the Nevada County Recorders with documents prepared, signed and falsely notarized by persons pretending to have the authority to sign the documents essential to the integrity of the public records system and required to be authentic for purposes of nonjudicial foreclosure, but which were neither authorized by the purported "Lenders" of record, nor were they authorized by the real parties in interest entitled to the remedy of nonjudicial foreclosure.

42. Even if MERS could ever have conveyed a beneficial interest in the HARKEY DOT

as nominee for NCMC (which HARKEY offers to prove that MERS had no power or authority to do in any event because MERS does not hold a beneficial interest in any DOT and is merely the name used on legal title for the purposes described herein), MERS had no power or authority to alienate the assets of NCMC effective April 2, 2007 without leave of the United States Bankruptcy Court for the District of Delaware which required NMCM to obtain an Order of the Bankruptcy Court which was never sought. Judicial Notice of the proceedings *In re New Century TR Holdings, Inc.*, Case No. 07-10416(KJC) is requested to prove that no such Order was sought or obtained.

43. NCMC had no assets whatsoever effective July 15, 2008 and MERS, as its agent (a nominee is a limited agent for the purposes described by the nomination), cannot claim to own any interest greater than that held by its principal.

44. Because NCMC had no interest in HARKEY's DOT on July 28, 2008 and, therefore, MERS, as nominee for NCMC could not convey any interest in the DOT which could no longer have been the property of NCMC, no "agent" of MERS could lawfully execute documents in the name of MERS as nominee for NCMC assigning the DOT more than a year later after the NCMC bankruptcy filing without an Order of the Delaware Bankruptcy Court (which was never procured) and after all NCMC assets were deemed transferred to the New Century Liquidating Trust effective July 15, 2008.

45. The Nevada Supreme Court held in *Edelstein v. Bank of New York Mellon*, 286 P. 3d 249 (2012) that the party seeking the remedy of nonjudicial foreclosure must hold both the Note and be the beneficiary of the DOT at the time of foreclosure and concluded on the facts of that case that MERS was a valid beneficiary as nominee of the DOT, in the instant case the truth of the MERS scheme will be shown, which will demonstrate the invalidity of MERS' claims to beneficiary status.

46. The MERS® system is a computer data base, owned and operated by MERSCORP, functions to conceal the identities of the holder of the Note by claiming that MERS is nominee of

beneficiaries of DOTs and grantees of mortgages, until a party to the racketeering enterprise described below seeks to confiscate real property purportedly encumbered by a lien to secure the payment of alleged debts, at which time, documents must be falsely created to make it appear that the party claiming the right to the judicial or nonjudicial foreclosure remedy is the lawful claimant.

47. In Nevada, the MERS scheme requires the creation of a series of documents by entities purporting to have the authority to do so in order to make it appear that there has been substantial compliance with the statutory requirements for nonjudicial foreclosure.

48.  At the purported "loan closing" on February 6, 2007, at which HARKEY believed he was obtaining a refinance of the mortgage on the subject property he owned since 2004 and when which the "MERS" nomination was sought by NCMC, HARKEY was provided with Exhibit 7, which falsely claimed that the purpose of naming MERS as nominee was to protect the lien of the ***Lender.***

49. Exhibit 7 does not disclose that the real purpose of the MERS nomination was to conceal the true nature of the transaction which was an undisclosed purchase and sale of securities consisting of HARKEY's Note and DOT without his knowledge or consent, which is identity theft in violation of 18 USC sec. 1028.

50.  The business plan of MERSCORP (now claimed to be proprietary policies and procedures since the *Bain* case revelations) purports to allow its "members" to transfer beneficial interests in mortgages and DOTs without requiring those interests to be assigned and without recording those interests with the Nevada County Recorders (or the public records in any state of the United States) but evolved into the MERS RACKETEERING ENTERPRISE (hereinafter the MERS RACKETEERING ENTERPRISE or the ENTERPRISE) of which HARKEY now complains.

51.  The ENTERPRISE exists to enable the concealment of the true nature of the securities purchases and sales masquerading as mortgage loans and to facilitate foreclosure of

real estate in violation of fundamental requirements of procedural due process whereby homeowners are not to be informed that their mortgage loans were not conventional loans but were concealed securities purchases and sales for which their Notes and mortgages or DOTs are the collateral.

52. The MERSCORP policies and procedures at the time of the creation of the HARKEY documents at issue herein purported to allow its "members" to foreclose in the name of MERS, without regard to the applicable state laws governing lawful foreclosure proceedings, which, in Nevada, requires the foreclosing party to be both the beneficiary of the DOT and the party entitled to enforce the Note at the time of the foreclosure.

53.  The undisclosed securities transaction into which HARKEY was made an unwitting participant required his Note and DOT as collateral for a securities sale to yet undisclosed third parties for which US BANK was suddenly was revealed as the purported Trustee of a TRUST to which DLJC sold securities to the undisclosed investors by the which the collateral had to be transferred within three (3) months of the closing date under the PSA and which could no longer be conveyed on July 28, 2008 when Exhibit 4 was signed and notarized by KOCH and CLARK.

54. The mortgages and DOTs granting "MERS" the legal status as nominee for "Lenders" further the unlicensed and unregulated purchase and sale of securities because the entities designated as Lenders did not loan money to the homeowners but were unlicensed securities dealers which obtained the Notes and mortgages or DOTs as collateral for undisclosed securities transactions whereby Notes and mortgages or DOTs were sold to undisclosed third parties for resale to REMIC trusts or government sponsored entities (GSEs).

55. The "MERS as nominee" scheme is the core of the ENTERPRISE which is intended to conceal the fact that what appeared to be a loan contract between homeowners and the purported "Lenders" was actually the sale of the homowners' Notes and mortgages or DOTs (securities) to an unlicensed securities purchaser (designated as "Lender" in the Notes and mortgages or DOTs, which is deceptively referred to as the "loan originator" in order to conceal

the true nature of the transactions.

56. The "mortgage loan" was an undisclosed securities transaction in which the "loan originator," which were unlicensed securities dealers like NCMC, purchased the securities (the Note and mortgage or DOT) for resale using credit transmitted by third parties and thereafter the "loan originators" retained "servicing rights" for the purpose of taking payments from the homeowners, who were the unwitting sellers of the securities (the Notes and mortgages or DOTs) to an unlicensed securities seller, the "loan originator," and whose "mortgage payments" were then to be distributed to the securities holders, who had been promised earnings on their investment under the trust Prospectuses.

57. MERSCORP, FNF, CSFBMS, DLJMC, SPS, LPS, WELLS FARGO, US BANK as Trustee of the TRUST, the TRUST and SAFEGUARD are all key participants in the MERS RACKETEERING ENTERPRISE.

58. The MERS RACKETEERING ENTERPRISE operates to conceal the truenature of the "mortgage loans" which were not conventional mortgage loans, asHARKEY was fraudulently led to believe, but were actually undisclosed purchases of theNotes and DOTs as collateral for the undisclosed securities offerings purchased and soldby unlicensed securities dealers (the "loan originators") for a commission and thereaftersold to investors in certificates of beneficial interests in trusts which are never identifiedas the real party in interest in the transaction until an effort to foreclose on the collateral ismade.

59.  The MERS RACKETEERING ENTERPRISE operates as a network ofentities which employ document signers who have no personal knowledge of the factsasserted in the documents they sign and are low level employees acting withoutknowledge of the scheme to defraud homeowners, their counsel, and the Courts of this nation to accomplish the goals of the ENTERPRISE: conversion of real estate interests into movable property (a physical impossibility); destruction of this nation's land title records by flooding the deed registries with fictitious documents; confiscation of the real estate interests without due process guaranteed

under the Fifth and Fourteenth Amendments to the *Constitution of the United States* and equal protection of the laws of the several states under the Fourteenth Amendment thereto by preventing the affected homeowners from knowing the identity of the real parties in interest who are making claims against them, which prevents them from petitioning the courts for redress of their grievances in violation of their rights under the First Amendment to the *Constitution of the United States* made applicable to the states under the Fourteenth Amendment thereto.

60. DLJMC sponsored the securities offering which represented that CSFBMS would "deposit" the collateral documents into the TRUST in the instant case.

61. The MERS RACKETEERING ENTERPRISE relies upon the creation of fictitious documents to make it appear that the Notes and DOTs were lawfully conveyed into the various trusts such as the TRUST at issue in these proceedings, when the collateral was not conveyed as required under New York Trust Law and 26 USC sec. 860D, both of which required strict compliance with the requirements of the PSA in order to fund the TRUST as a static entity with three (3) months of the TRUST closing date, which was September 28, 2007.

62. Nevada allows the Note and the DOT to travel along different paths, but the Note and DOT must be held by a single entity at the time a foreclosure action is initiated.

63.   The record filings in this case are fictitious documents, created without any connection to true facts upon which the claimed right to foreclose must be founded.

64. The Notice of Default (NOD) in the instant case, dated July 1, 2008, was falsely created by LPS employees BEWLEY and NOEL and purported "That **Quality Loan Service Corp. is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary** under a Deed of Trust dated 2/6/2007, executed by MICHAEL HARKEY, A SINGLE MAN, as Trustor, to secure certain obligations in favor of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR NEW CENTURY MORTGAGE CORPORATION" and executed by BEWLEY for "Quality Loan Service Corp. as agent for 'BENEFICIARY' by Fidelity National Title Insurance Company FIS

1  DEFAULT SOLUTIONS." (Emphasis added.)

2      65.  Defendant QLSC was not, on July 1, 2008, the original trustee, the duly appointed

3  substituted trustee and, upon information and belief, was not the authorized agent for the trustee,

4  which was First American Title Insurance Company; QLSC could not have been the beneficiary

5  of the DOT, which was NCMC or its nominee, MERS, for the reasons set forth above.

6      66. Furthermore, no authority could lawfully have been given to QLSC by the

7  "BENEFICIARY" (NCMC, then and there in bankruptcy proceedings) or from QLSC to "FIS

8  DEFAULT SOLUTIONS" (which was, in actuality, FNF directing employees of its subsidiary

9  LPS), or to QLSC by First American Title Insurance Company, the Trustee, and QLSC had not

10  been lawfully substituted as the Trustee of the DOT by NCMC or MERS, its purported nominee,

11  and BEWLEY had no authority to sign the NOD on July 1, 2008.

12      67.  Upon information and belief, BEWLEY had no personal knowledge of the identity of

13  the party for which he was signing the NOD or that a default in payments on the Note had

14  occurred.

15      68.  Moreover, NOEL admitted that he would notarize documents before they were

16  signed (Exhibit 3) and, therefore, BEWLEY was not required to prove any authority for his

17  signing of the NOD in any capacity whatsoever.

18      69.  The NOD is a fictitious document, created by LPS employee BEWLEY, who was not

19  employed by any party with an interest in the Note and DOT and BEWLEY could not have

20  known of his own personal knowledge whether or not a default had occurred and, by the clear

21  language contained in the NOD, BEWLEY did not know to what entity the payments on the Note

22  were required to be made have been made because the NOD purports to give notice on behalf of

23  a variety of possible parties as set forth in paragraph 56, above.

24      70.  The Trustee of record on the DOT on July 1, 2008 was First American Title

25  Insurance Company and not QLSC and BEWLEY was not employed by any party with a lawful

26  interest in the Note or DOT.

27

28                                             18

71. The Lender of record on the DOT on July 1, 2008 was NCMC, then and there in bankruptcy proceedings, and MERS, as its nominee, could not convey an interest in any property which its principal did not have the power to convey.

72.   Paragraph 22 of the HARKEY DOT provides for HARKEY's rights under the DOT when the Lender makes an allegation of a default and provides:

> *22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option, and without further demand, may invoke the power of sale, including the right to accelerate full payment of the Note, and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence. If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold, and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender shall mail copies of the notice as*

*prescribed by Applicable Law to Borrower and to the persons prescribed by*

*Applicable Law. Trustee shall give public notice of sale to the persons and in the*

*manner prescribed by Applicable Law. After the time required by Applicable Law,*

*Trustee, without demand on Borrower, shall sell the Property at public auction to*

*the highest bidder at the time and place and under the terms designated in the*

*notice of sale in one or more parcels and in any order Trustee determines. Trustee*

*may postpone sale of all or any parcel of the Property by public announcement at*

*the time and place of any previously scheduled sale. Lender or its designee may*

*purchase the Property at any sale. Trustee shall deliver to the purchaser Trustee's*

*deed conveying the Property without any covenant or warranty, expressed or*

*implied. The recitals in the Trustee's deed shall be prima facie evidence of the*

*truth of the statements made therein. Trustee shall apply the proceeds of the sale*

*in the following order: (a) to all expenses of the sale, including, but not limited to,*

*reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security*

*Instrument; and (c) any excess to the person or persons legally entitled to it.*

73.  HARKEY was not provided with the notice and information required by Paragraph 22 of the DOT, which voids all subsequent actions under NRS 107.080.

74. Contrary to paragraph 22 of the DOT, LPS employees, who had no personal knowledge whether or not a default occurred or whether HARKEY had been provided with his rights under paragraph 22 of the DOT, prepared and recorded the fictitious NOD, in the name of various alternative entities, none of which are identified by name except QLSC, which was not then the Trustee or the Lender before the notices required under paragraph 22 were provided (and the notices never were provided.)

75. Paragraph 22 of the DOT does not permit that filing of an NOD before the rights under paragraph 22 are provided and further does not authorize the NOD to be prepared and recorded by any party to the DOT, except the Trustee or Lender.

76. LPS employees BEWLEY and NOEL signed and notarized the NOD and Fidelity National Default Solutions caused the NOD to be recorded contrary to paragraph 22 of the DOT and instructed the return of the NOD to QLSC, which was not then the Trustee or the Lender under the DOT.

77. On July 1, 2008, LPS employee ALLEN signed a purported Substitution of Trustee (SOT) in the pretended capacity of "U.S. Bank National Association, as trustee, on behalf of the holders of the CSMC Mortgage-Backed Pass-Through Certificates, Series 2007-6 by Select Portfolio Servicing, Inc., its Attorney in Fact," which was purportedly notarized by LPS employee MOUA on July 7, 2008, and recorded on July 11, 2008.

78. ALLEN was not an officer or employee of SPS and MOUA was a captive notary employed by LPS, who did not even bother to pretend to notarize the SOT falsely signed by ALLEN on the same date as the date upon which ALLEN purports to have signed the document.

79. On July 28, 2008, Defendant KOCH, who actually was an employee of SPS, falsely signed a Corporate Assignment of Deed of Trust in the pretended capacity of Assistant Secretary of "MERS AS NOMINEE FOR NEW CENTURY MORTGAGE CORPORATION, which, as stated above, had no lawful interest in the DOT on that date.

80. On July 28, 2008, Defendant CLARK, notarized the signature of KOCH, stating, "On July 28, 2008, before me, KIMBERLY CLARK, a Notary Public in and for Salt Lake in the State of Utah, personally appeared Bill Koch, Assistant Secretary, MERS AS NOMINEE FOR NEW CENTURY MORTGAGE CORPORATION personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument," which gave the false appearance that MERS had NCMC's authority to assign the DOT.

81. CLARK knew that KOCH was an employee of SPS and was not an Assistant

1  Secretary of MERS and the notarization of the Corporation Assignment of Deed of Trust was

2  false.

3      82. The falsely signed and notarized Corporation Assignment of Deed of Trust was

4  recorded on August 6, 2008 with the Clark County Recorder, and purports to create a legal

5  interest in the DOT in favor of U.S. Bank National Association, as Trustee, on behalf of the

6  Holders of the CSMC Mortgage-Backed Pass-Through certificates, Series 2007-6, which could

7  not have been accomplished on that date by MERS, as agent for the bankrupt NCMC, which then

8  had no assets whatsover, all assets having been deemed transferred to the New Century

9  Liquidating Trust effective July 15, 2008.

10      83. On January 12, 2009, HARKEY filed for bankruptcy protection in the United States

11  District Court for the Western District of Washington in Case No. 09-10180(TTG). (Exhibit 8.)

12      84. On January 12, 2009, sale of the subject property was purportedly conducted by the

13  unlawfully substituted QLSC as Trustee at which time a credit bid in the amount of

14  $1,063,633.71 was purportedly made by U.S. Bank National Association, as Trustee, on behalf of

15  the Holders of the CSMC Mortgage-Backed Pass-Through certificates, Series 2007-6.

16      85.  It is believed in good faith that the automatic stay was in effect in HARKEY's

17  bankruptcy, on January 13, 2009, a Trustee's Deed Upon Sale was signed by QLSC employee,

18  Defendant GONZALES, and notarized the following day, on January 14, 2009 by Defendant

19  NGUYEN, who stated, under penalty of perjury:

20          *On 1/14/2009, before me, Michelle Nguyen a notary public, personally*

21          *appeared Vanessa Gonzales, who proved to me on the basis of satisfactory*

22          *evidence to be the person(s) whose name(s) is/are subscribed to the within*

23          *instrument and acknowledged to me that he/she/they executed the same in*

24          *his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the*

25          *instrument the person(s), or the entity upon behalf of which the person(s) acted,*

26          *executed the instrument.*

27

28                                      22

*I certify under PENALTY OF PERJURY under the laws of the State of*

*California that the foregoing paragraph is true and correct.*

86. GONZALES did not appear and sign the Trustee's Deed Upon Sale before NGUYEN on January 14, 2009 because the Trustee's Deed Upon Sale was signed by GONZALES on January 13, 2009.

87. On January 16, 2009, the falsely acknowledged Trustee's Deed Upon Sale, purporting to grant and convey the property to US Bank, was recorded with the Clark County Recorder by "Fidelity National Default So" was instructed to be returned to "U.S. Bank, National Association" at 3815 S.W. Temple, Salt Lake City, UT 84115-4412, which is the address of SPS. (Exhibit 6.)

88. Upon information and belief, SPS is a subsidiary of CREDIT SUISSE, two other subsidiaries of which, Defendants CSFBMS and DLJMC, are the depositor and sponsor, respectively, of a securities offering, which was the true purpose of the transaction, undisclosed to HARKEY, in which the collateral consisting of HARKEY's Note and DOT were purchased by NCMC on February 6, 2007 for resale as collateral for the sale of Certificates in the Defendant CSMC Trust 2006-7, the essential facts of the purported loan transaction having been concealed from HARKEY.

89. The MERS® system operated by MERSCORP is believed to exist for the purpose of allowing the name "Mortgage Electronic Registration Systems, Inc." to appear on DOTs in order to conceal the true nature of the transactions masquerading as mortgage loan transactions, but which are actually concealed securities purchases and sales and to facilitate the unlawful foreclosures without due process of real estate interests which were never lawfully conveyed into the various REMIC trusts.

90. Upon information and belief, MERSCORP owns and operates the MERS® computer data base program to allow its "members" to conceal the true nature of the transactions masquerading as mortgage loan transactions, but which are concealed securities transactions, so

that its members can avoid regulation and detection of what is a nation-wide racketeering enterprise, using wire fraud, mail fraud and identity theft, to defraud homeowners and investors because the securities offered to the investors are, in fact, not backed by Notes and DOTs by lawful conveyances made to the REMIC Trusts prior to the closing dates of the trusts, as represented by the Prospectuses, mandated by the individual trusts' PSAs and required by 26 USC 860D.

91. Exhibits 2, 4, 5 and 6 were transmitted by wire and mail in order to defraud HARKEY, his counsel, the courts and the public to effectuate the foreclosure of HARKEY's real estate without procedural due process guaranteed by the Fifth and Fourteenth Amendments to the *Constitution of the United States* and prevent him from defending against the unlawful foreclosure, a right guaranteed by the First Amendment to to the *United States Constitution* made possible by the use of false documents fabricated by LPS, SPS and QLSC employees who were employed solely for the purpose of signing documents to effectuate the unlawful confiscation of HARKEY's real estate.

92. CREDIT SUISSE, believed to be the parent company of CSFBMS, DLJMC and SPS, served on the US Dollar LIBOR Panel in 2007-2008, manipulated the interest rates upon which financial instruments were calculated and was instrumental in the collapse of the real estate market in the United States in 2008. (Exhibit 9 attached hereto and incorporated by reference.)

93. CSFBMS, DLJMC, SPS, LPS, QLSC, WELLS FARGO, US BANK and SAFEGUARD are members of MERSCORP and FNF used LPS employees to sign, execute and record documents for the MERS RACKETEERING ENTERPRISE.

94. HARKEY's DOT was not even pretended to have been assigned to the TRUST until July 28, 2008 and was then assigned by a fictitious document prepared by SPS employees KOCH and CLARK, who claimed that SPS employee KOCH was an Assistant Secretary of MERS as nominee for the bankrupt NCMC, without the permission of the Bankruptcy Court.

95. All of the documents filed with the Clark County Recorder were fictitious, from the

1  original DOT signed by HARKEY in favor of NCMC with MERS as purported nominee

2  (because NCMC was not the Lender), MERS was named only to make it appear that a loan was

3  being made by NCMC, and the MERS nomination was intended to defraud HARKEY by

4  concealing the intended sale of his Note and DOT as collateral for an undisclosed securities

5  offering; the NOD filed by QLSC was filed before QLSC was purportedly appointed as Trustee

6  by LPS employee BEWLEY pretending to be authorized by QLSC or a variety of other possible

7  entities (not identified by name), which document was falsely acknowledged by NOEL, who

8  notarized documents before they were signed; the Substitution of Trustee was signed by LPS

9  employee ALLEN on July 1, 2008, notarized by LPS employee MOUA on July 7, 2008 and

10  recorded on July 11, 2008, eight (8) days AFTER the false and fraudulently notarized NOD was

11  recorded purportedly having been authorized by QLSC as Trustee or a variety of other entities;

12  the Corporation Assignment of the DOT was signed by SPS employee KOCH and notarized by

13  CLARK on July 28, 2008 in KOCH's falsely claimed capacity as Assistant Secretary of MERS

14  for the bankrupt NCMC, a legally impossible conveyance; and the Trustee's Deed Upon Sale

15  conveyed HARKEY's real estate to US BANK as Trustee of the TRUST, which never obtained

16  the right to foreclose on lawful documents and, upon information and belief, precluded by the

17  automatic stay in HARKEY's bankruptcy believed to have been in effect, all in breach of

18  paragraph 22 of the DOT, all made possible by the operations of the MERS RACKETEERING

19  ENTERPRISE in which the key participants are members.

20      96. There is not one authentic transaction in the entire document creation scheme because

21  the MERS RACKETEERING ENTERPRISE exists for the purpose of concealing the identities

22  of the real parties in interest in the securitization scheme, of which the homeowners and investors

23  are intended by the racketeering conspirators to be kept ignorant.

24      97. The ENTERPRISE conceals the true nature of the transaction from the homeowners

25  and prevents the discovery of real parties in interest in the concealed transaction.

26      98. The ENTERPRISE conceals the failure of the participants in the securitization

27

28                                                    25

scheme to lawfully and timely convey the assets (which are represented to be the collateral for the securities offering) when the collateral has not been lawfully conveyed in the manner and time-frame represented in the Prospectus and Pooling and Servicing Agreement.

99. In furtherance of the scheme on behalf of its members, MERSCORP instructs the creation of the fictitious documents for recording in the public record and knowingly or recklessly permits the creation and transmission of the documents by wire and mail in violation of 18 USC secs, 1343 and 1341, respectively.

100. It is the identity of homeowners, such as HARKEY, which are fraudulently taken at the purported mortgage loan closings (securities collateral purchases) by which participants in the ENTERPRISE purport to collateralize the securities offerings, without the knowledge and consent of the person whose identity is taken to be sold in the securities offering, in violation of 18 USC sec. 1028.

101. The scheme of the ENTERPRISE  unravels at the point at which there is an alleged default in payments under the Note and the fictitious document fabrication process must then begins and fabricated documents are transmitted by wire and mail to the public records offices in order to give the appearance of substantial compliance with nonjudicial foreclosure processes.

102. HARKEY and his counsel relied upon the validity of the fictitious documents in evaluating his claims and defenses and HARKEY did not begin to suspect that the documents of record were fictitious and that the NOD and the Substitution of Trustee had been prepared by employees of LPS until December 5, 2011, when the Attorney General for the State of Nevada issued a press release after the Grand Jury Testimony was completed and HARKEY recognized the name of NOEL, who had notarized the fictitious NOD in the instant case. (See the attached Exhibit 10.)

103. This action is commenced within three (3) years of the date upon which HARKEY suspected the fraudulent filings and was on constructive notice thereof.

**COUNT ONE**

**Racketeering in Violation of NRS 207.470 (State RICO)**

104. HARKEY realleges paragraph 1-102 as if fully set forth therein.

105. HARKEY alleges that the acts complained of herein have the same or similar pattern, intents, results, accomplices, victims or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated incidents within 4 years and in which the aggregate loss or intended loss is more than $650 in violation of NRS 205.377, which are predicate acts under NRS 207.470 and HARKEY specifically alleges:

    a. The pattern is the use of the MERS® system to conceal the true nature of the underlying transaction which is not a mortgage loan, but was the purchase and sale by unlicensed persons of HARKEY's Note and DOT for use as collateral for an undisclosed securities transaction, the participants in which were intended to remain secret until the goal is sought to be accomplished, which is the attempt to confiscate the real estate collateral for the benefit of the members of the ENTERPRISE for the profit of its participants.

    b. The intent of the ENTERPRISE is to conceal the true nature of the securities transaction by which the Notes and DOTs are purchased and sold without the knowledge and consent of the homeowners; to destroy the integrity of the land title system in the United States in order to conceal the securities frauds; to establish its methods of confiscating homes for the benefit of the ultimate false claimants to the real estate assets, which are purported to be REMIC trusts or GSEs, but which are actually the national banking associations which have conspired to use the MERS® system to increase their profits by trading homeowners Notes and DOTs as a false currency internationally, to increase their profits from trading on the assets of homeowners by insurance devices such as mortgage insurances, credit default swaps and derivative trades by which they manipulate the international markets in order to profit from the trading in assets which do

27

not lawfully belong to them.

c. US BANK, WELLS FARGO, the TRUST and other national banking associations and REMIC Trusts, as well as GSEs commonly known as Fannie Mae and Freddie Mac (the Federal National Mortgage Corporation and the Federal Home Loan Mortgage Corporation, respectively) engage in identical conduct under the MERS® system throughout the United States with the goal of liquidating real estate assets, after the profit from trading in the securities derived therefrom has been maximized, in order to conceal the operations of the ENTERPRISE for the benefit of each other, using the MERS® system, LPS and their own in-house document fabrication operations, following the pattern alleged in the instant case.

d. The fabrication, execution and recordation of fictitious documents with the intent to defraud HARKEY and others similarly situated by depriving them of the possession, use and enjoyment of his real estate is the method of commission of the ENTERPRISE goals, which are the results intended.

e. The results sought and obtained by the violations of NRS 205.377 and NRS 205.395 (reserved for supplemental pleadings) is the destruction of the integrity of land title records throughout the United States and the confiscation of real estate for the benefit of undisclosed parties.

f. The accomplices are the employees of the entities named herein, employees of other entities engaged in the same business plan operating under the MERS® system and other entities which engage in similar practices by which one entity will sponsor a securities offering, purchase and sell the Notes and mortgages or DOTs into a REMIC trust of which another entity acts as trustee, all concealing the interrelationship between the entities participating in the global scheme from the public, the courts and the victims of their fraudulent document creation and recordation processes.

106. The victims of the fictitious document creation and recordation scheme are the

property owners, such as HARKEY, who are deceived into believing that the fictitious

documents are authentic and authorized and who cannot discern the real parties in interest against

whom they can make valid claims; the public, which cannot access accurate documents in the

land title records; the state and federal courts in the State of Nevada, which believe they may rely

on fictitious documents and are mocked the MERS® system's operations.

107. The ENTERPRISE operations are interrelated and have the distinguishing

characteristics of MERSCORP instructing and procuring the creation of fictitious documents

falsely signed without lawful authority and falsely notarized without proof of the authority of the

signer (and knowing the signer does not have the authority claimed.)

108. The acts specified herein constitute more than two predicate acts in violation of NRS

205.377 consisting of the fraudulent misrepresentation of the transaction characterized as

mortgage financing, which is, in actuality the unlicensed and unregulated purchase and sale of

Notes and DOTs (Exhibit 1: taken by fraudulent misrerpesentation on February 6, 2007 and

continuing to be used through January 16, 2009 by DLJMC, CSFBMC, WELLS FARGO, US

BANK, the TRUST and MERSCORP); falsification of recorded documents (including, but not

limited to Exhibit 2 the NOD: on or about July 1, 2008 by LPS, directed by FNF,  in conspiracy

with QLSC, DJMC, CSFBMC, SPS, WELLS FARGO, US BANK, the TRUST and

MERSCORP; Exhibit 4, the SOT: on July 11, 2008 by LPS, directed by FNF,  in conspiracy with

QLSC, DJMC, CSFBMC, SPS, WELLS FARGO, US BANK, the TRUST and MERSCORP;

Exhibit 5, the Corporation Assignment of DOT on August 6, 2008 by SPS in conspiracy with

QLSC, DJMC, CSFBMC, WELLS FARGO, US BANK, the TRUST and MERSCORP; and

Exhibit 6, the Trustee's Deed Upon Sale by QLSC on January 16, 2009 in conspiracy with

DJMC, CSFBMC, SPS, WELLS FARGO, US BANK and MERSCORP.)

109. The essential participants in the fraudulent document scheme are DLJMC,

CSFBMC, MERSCORP, FNF, LPS, WELLS FARGO, US BANK, SPS and QLSC between

February 6, 2007 and August 3, 2009, when the Writ of Restitution was entered by Judge David

S. Gibson, Sr. in Clark County, Nevada Justice Court in Case No. 09-CH-00168, because the original DOT which was taken by identity theft and the subsequent fictitious documents were transmitted by wire by and between the Defendants and their agents, in violation of 18 USC sec. 1343.

110.  The fictitious documents were intentionally filed in the Clark County Recorder's Office with the intent that HARKEY, his counsel, the courts and the public would rely upon the recorded documents as valid and take action or refrain from taking action in reliance thereon.

111.  HARKEY and his counsel did rely on the documents complained of and did not seek to enjoin the Trustee's sale, although HARKEY sought bankruptcy protection in the United States District Court for the Western District of Washington.

112. On the basis of the theft of his identity and the subsequent creation of fictitious documents, transmitted by mail and wire, HARKEY was damaged and continues to be damaged in his property rights and his due process rights as described above and below to this day.

113. As detailed above, the incidents were not isolated and have spanned more than four (4) years.

114. US BANK sold the subject premises to which it did not have lawful title for a $168,500.00 in October, 2010 to the BEUTLERS, which was far below market value and, therefore,  the BEUTLERS are not a bona fide purchasers for value and because the title flowed from a recorded nonjudicial foreclosure the BEUTLERS had prior notice of HARKEY's claim.

115. The BEUTLERS have been renting the subject premises for $2,500.00 per month since they took possession of the subject premises in or around October, 2010 and have profited from the rental receipts of the premises to the detriment and damage of HARKEY.

116. The BEUTLERS claim of title to the subject premises is founded upon a false foreclosure sale by US BANK and is inferior to the claim of HARKEY.

117. The BEUTLERS must be required to disgorge their profits from the rental of the property to HARKEY and must be required to surrender possession to HARKEY.

118. The Defendants named herein are liable to HARKEY for treble damages and his actual attorney fees and costs of this action, in addition to the return of the real estate to his possession.

## COUNT TWO

### Racketeering in Violation of 18 USC sec. 1961, et seq. (Federal RICO)

119.  HARKEY realleges paragraphs 1-111 as if fully set forth herein.

120.  The acts specified herein constitute more than two predicate acts in violation of 18 USC sec, 1961, et seq., consisting of identity theft (Exhibit 1: in violation of 18 USC sec. 1028 on February 6, 2007 and continuing through January 16, 2009 by DLJMC, CSFBMC, FNF, LPS, QLCS,  US BANK, SPS, and MERSCORP); mail fraud (in violation of 18 USC sec. 1341 on various dates, including, but not limited to Exhibit 2, the NOD: on or about July 1, 2008 by LPS, directed by FNF, in conspiracy with QLSC, DJMC, CSFBMC, SPS, WELLS FARGO, US BANK and MERSCORP; Exhibit 4, the SOT: on or about July 7, 2008 by LPS, directed by FNF, in conspiracy with QLSC, DJMC, CSFBMC, SPS, WELLS FARGO, US BANK and MERSCORP; Exhibit 5, the Corporation Assignment of Deed of Trust, by SPS in conspiracy with QLSC, DJMC, CSFBMC, WELLS FARGO, US BANK and MERSCORP; and Exhibit 6, the Trustee's Deed Upon Sale by QLSC, in conspiracy with DJMC, CSFBMC, SPS, WELLS FARGO, US BANK and MERSCORP.)

121. Wire fraud was committed by DLJMC, CSFBMC, MERSCORP, LPS, directed by FNF, WELLS FARGO, US BANK, SPS and QLSC between February 6, 2007 and August 3, 2009, when the Writ of Restitution was entered by Judge David S. Gibson, Sr. in Clark County, Nevada Justice Court in Case No. 09-CH-00168, because the original DOT which was taken by identity theft and the subsequent fictitious documents were transmitted by wire by and between the Defendants and their agents, in violation of 18 USC sec. 1343.

122. The fictitious documents remain recorded in the Clark County Recorder's Office and are relied upon as valid public documents to this day.

123. On the basis of the theft of his identity and the subsequent creation of fictitious documents, transmitted by mail and wire, HARKEY continues to be damaged in his property rights and his due process rights as described above and below to this day.

124. HARKEY has been excluded, since October 3, 2009, from the possession, use and enjoyment of his property which was valued in excess of $960,000.00 on the date of the identity theft, on February 6, 2007, and which is now valued in excess of $500,000.00 and has a monthly rental value of no less than $4,000.00, exclusive of costs of maintaining the residence but including all amenities attendant to the property.

125. SAFEGUARD participates in the ENTERPRISE by receiving referrals from the national banking associations which work in concert to conceal the real parties in interest in the MERS® system by contributing the "trash out" services to the ENTERPRISE, by which homeowners are intimidated by the breaking and entering into their homes and are thereby destablized, distracted and intimidated in their efforts to resist unlawful foreclosures.

126.  Upon information and belief, FENN, as agent for US BANK, brought the SAFEGUARD "trash out" services into the instant case and participated in the  ENTERPRISE procedure of destabilizing, distracting and intimidating HARKEY, who  lost all of his personal possession which were taken and not returned to him by  SAFEGUARD agents no earlier than March 18, 2010.

127. FENN, as a licensed real estate agent, knew that personal property of  persons in possession of real estate is to be stored for a reasonable period of time, with  notice to the person who was in residence, to permit the recovery of the property  removed, even if that party was no longer entitled to possession of the real estate, which  HARKEY was and still is.

128. SAFEGUARD served the ENTERPRISE's purposes of destabilizing,  distracting and intimidating HARKEY when its agent, Susan Morgan, first agreed to  return HARKEY's personal belongings and then SAFEGUARD repudiated the existence  of Susan Morgan and advised HARKEY's counsel that the HARKEY's personal property  had been hauled to the city

1 dump, when it knew or should have known that the valuable personal property had been taken

2 by its agents with the intent to permanently deprive HARKEY of its possession .

3     129. HARKEY was thereafter invited to make a claim against SAFEGUARD, which

4 SAFEGUARD fraudulently promised to review, but instead waited until it believed that the

5 Statute of Limitations on conversion had expired, failing to recognize the alternative theory of

6 liability asserted here that it is as a co-conspirator under the federal RICO statutes, because it

7 acts to destabilize, distract and intimidate the victims of the ENTERPRISE by confiscating the

8 victims' personal property in the course of illegal foreclosure proceedings undertaken on

9 fictitious documents.

10     130. Under 18 USC sec. 1964, HARKEY is entitled to treble his damages, for the loss of

11 his valuable personal property with an estimated replacement value in excess of $100,000.00,

12 amounting to in excess of $300,000.00, along with his actual attorneys fees and costs of this

13 action, for the Defendants' violations of 18 USC sec. 1961, et seq.

14     131. Under 18 USC sec. 1964, HARKEY is entitled to treble his damages, including his

15 loss of enjoyment of the subject premises, rental value in the amount of no less than $216,000.00

16 amounting to $648,000.00, along with his actual attorneys fees and costs of this action, for the

17 Defendants' violations of 18 USC sec. 1961, et seq.

18 <div align="center">**COUNT THREE**</div>

19 <div align="center">**A. Violations of Civil Rights Under 42 USC sec. 1983 and**</div>

20 <div align="center">**B. Proposed Limited Class Action Under F. R. Civ. P. 23**</div>

21     132. HARKEY realleges paragraphs 1-123 as if fully set forth herein.

22     **A. Individual Action for Violation of Due Process and Equal Protection Rights**

23     133. The fraudulent documents used to confiscate HARKEY's real estate and upon

24 which his personal possession were additionally confiscated was undertaken by the Defendants

25 QLSC, SPS, LPS, WELLS FARGO, as Master servicer of the TRUST, which is liable for the

26 conduct of its subservicer, LPS as the agent of QLSC and SPS, US BANK as Trustee of the

27

28 <div align="center">33</div>

TRUST, the TRUST and MERSCORP, pretending to replace the Clark County Register of Deeds as the repository of title information, are acts taken under color of the Nevada nonjudicial foreclosure statutes and constitute state action, allowed hereunder.

134. HARKEY has been deprived of his personal and real property rights by the conduct of all of the Defendants, each purporting to have the color of official right in a continuing effort to confiscate his property without due process and equal protection of the laws guaranteed by the Fifth and Fourteenth Amendments to the *Constitution of the United States.*

### B. Proposed Class Action for Limited Relief

135. The MERS RACKETEERING ENTERPRISE is designed to deprive HARKEY and others similarly situated of their First Amendment rights to petition the government for redress of grievances, made applicable to the several states under the Fourteenth Amendment to the *Constitution of the United States* and HARKEY and tens of thousands of citizens and residents of the State of Nevada have, in fact been deprived of judicial redress as a direct result of the ENTERPRISE scheme to defraud them, the courts, and the County Recorders in the State of Nevada, in which the fictitious documents authorized by the ENTERPRISE are recorded.

136. HARKEY is a suitable lead class Plaintiff because he intends to expend his resources to effect justice for those less fortunate who have been injured by the combined actions of MERSCORP, QLSC and LPS in the State of Nevada.

137. Counsel for HARKEY is qualified to represent the class of victims of the MERSCORP/QLSC/LPS document fabrication and recordation scheme in the State of Nevada, by which real property owners were deprived of their rights to judicial redress by the actions of MERSCORP, QLSC, SPS and LPS in this State if this action is certified as a Class Action under F.R. Civ. P. 23.

138. The relief sought for the Class will not involve damages and will be limited to the required correction and removal of fraudulent documents recorded in the offices of the Nevada County Recorders, under NRS 205.395, plus reasonable attorney's fees and costs of pursuing

1   relief for the Class.

2      139.   LPS had already acknowledged that it is required to comply with NRS 205.395 by

3   JOINT STIPULATION TO ENTRY OF FINAL JUDGMENT (the Stipulation) between Lender

4   Processing Services, Inc., the Attorney General for the State of Connecticut and the Attorneys

5   General of forty-five (45) other states and the District of Columbia, executed on January 30,

6   2013 attached hereto as Exhibit 11.

7                               **COUNT FOUR**

8      **Common Law Fraud and Request for Declaratory Judgment Quieting Title to**

9         **2220 Village Walk Drive, Unit 3315, Henderson, Nevada 89052**

10     140.   HARKEY realleges paragraphs 1-131 as if fully set forth herein.

11     141. The acts complained of in which all named Defendants engaged constitutes common

12   law fraud and conspiracy to defraud HARKEY for the purpose of confiscating his real and

13   personal property and the benefit of the use, enjoyment and profit from the same, in which each

14   Defendant, for his or her own personal gain (even when the gain was limited to minimal wages

15   for the services provided in signing, notarizing and recording fictitious documents) sought to

16   benefit at HARKEY's expense.

17     142.   HARKEY is entitled to his actual damages from each of the Defendants, jointly and

18   severally, in an amount to be proved at trial.

19     143. HARKEY is entitled to restitution for the loss of his personal property from QLSC,

20   US BANK, the TRUST, SAFEGUARD and FENN which was fraudulently taken from him

21   under the pretense that he was not entitled to the continuing use and occupancy of the subject real

22   estate.

23     144.   HARKEY is entitled to the disgorgement of all profits made from the sale of

24   his Note and DOT from DLJMC and CSFBMS, WELLS FARGO, US BANK and the TRUST.

25     145.   HARKEY is entitled to his damages from the confiscation of his real property from

26   which he has been excluded from occupancy, use and possession since August 3, 2009.

27

28                               35

146.  HARKEY has suffered mental anguish and continues to suffer mental anguish from the fraudulent conduct of the Defendants, by whose frauds he has been excluded from the possession, use, occupancy and enjoyment of the subject premises since August 3, 2009.

147.  HARKEY will show by clear and convincing evidence that CSFBMS, DLJMC, MERSCORP, QLSC, SPS, FNF,  LPS, US BANK and WELLS FARGO or certain of them are guilty of oppression and fraud and seeks, in addition to the compensatory damages punitive and exemplary damages for the sake of example and by way of punishing the Defendants named in this paragraph.

148. HARKEY is entitled to a declaratory judgment quieting the title to the subject premises under 28 USC sec. 2202 and an Order restoring him to possession of the subject premises because his title is superior to all other recorded claims after the recording of his DOT dated February 6, 2007 and recorded on February 15,  2007.

149. HARKEY is entitled to an Order pursuant to 28 USC sec. 2201 restoring him to possession of 2220 Village Walk Drive, Unit 3315, Henderson, Nevada 89052.

150. HARKEY is entitled to such further, additional and alternative remedies for his damages and losses under 28 USC sec. 2201 as this Court may deem just and appropriate in these premises.

**COUNT FIVE**

**Quiet Title:  Defendants Acted Outside Scope of NRS 107 .080**

151. Plaintiffs hereby reallege and incorporate each and every allegation set forth above as if the same was more fully set forth herein.

152. Pursuant to NRS 30.030, NRS 40.010, and 28 USC § 2202, Plaintiff seeks a declaration of rights between the parties herein.

153. As discussed in paragraphs 14, 15, 63-75, 94, 101, 104, 107, and 119 above, Defendants NRS 107.080 were not the authorized or proper parties to exercise the power of sale and to conduct a non-judicial foreclosure as set forth under the note and deed of trust pursuant to

NRS 107.080.

154. Pursuant to NRS 107.080(14)(b), *"'Trustee' means the trustee of record.*"

155. As discussed above in paragraph 74, pursuant to paragraph 22 of the Deed of Trust, the NOD must be filed by the Trustee or the Lender as a condition precedent to sale.

156. As more fully discussed in Paragraphs 16, 17, 74-77, and 83 above, the purported trustee conducting the "Trustee's Sale" was not the lawful Trustee of Record.

157. As Defendants were not the authorized or proper parties to exercise the power of sale pursuant to NRS 107.080 et seq., and as the purported Trustee was not the lawful Trustee of Record, Defendants are not entitled to rely on the benefits of those statutes that are afforded to authorized or proper parties.

158. Pursuant to the ruling in *Karl v. Quality Loan Service Corp.*, Case No. 3:10-cv-00473-RCJ-VPC, Plaintiff herein seeks a ruling that "would neither discharge the debt nor invalidate the security interest, but simply result in a ruling that unless and until foreclosure is properly carried out, Plaintiff holds superior title to the Property as against one or more Defendants."

159. Plaintiff is therefore entitled to a declaratory judgment quieting the title to the subject premises as against the Defendants herein, because his title is superior to all other recorded claims after the recording of his DOT dated February 6, 2007 and recorded on February 15, 2007.

WHEREFORE, Plaintiff, expressly reserving his right to amend or supplement this First Amended Complaint to include a claim under NRS 205.395 if LPS and SPS fail to correct the fraudulent documents recorded against the subject premises, reserves his right to further amend this Complaint should this Court identify deficiencies therein and to amend this and subsequent allowed amended and supplemental Complaints at the time of trial of the action to conform to the proofs and to include all items of damage not yet ascertained and demands judgment against Defendants, as follows:

As to Counts One and Two:

1. For treble PLAINTIFF's actual damages in an amount to be proven at trial.

2. For PLAINTIFF's attorneys' fees and costs of this action.

As to Count Three:

1. For PLAINTIFF's damages resulting from the violation of his civil rights.

2. For PLAINTIFF's attorneys' fees and costs under 42 USC sec. 1988.

' As to Count Four:

1. For PLAINTIFF's actual damages in an amount to be proven at trial.

2. For exemplary damages in the amount allowed by NRS 42.005.

3. For judgment quieting title and restoring PLAINTIFF to possession of his home under 28 USC sec. 2202.

4. For such further remedy as may be necessary to effect justice under 28 USC sec. 2201.

5. For PLAINTIFF's attorneys' fees and costs of this action.

As to Count Five:

1. In the alternative to the declaratory judgment requested in Count Four, for judgment quieting PLAINTIFF's title under NRS 40.010.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial to all issues triable to by a jury.

DATED this 17th day of March, 2014.

*/s/ Mitchell Posin*

_____

Mitchell Posin, Esq., attorney for Plaintiff

1

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

2

MICHAEL HARKEY
3            Plaintiff and Proposed Lead Class
             Plaintiff for All Nevada Property
4            Owners Similarly Situated,
             who were deprived of their
5            right to petition the judiciary          Case No.  2:14-cv-00177-MMD-GWF
             for redress of grievances by
6            the use of fraudulent recorded
             documents by the MERS
7            ENTERPRISE described herein
     vs.
8

US BANK, N.A., AS TRUSTEE FOR
9    THE CSMC MORTGAGE-BACKED
     TRUST 2007-6; CSMC
10   MORTGAGE-BACKED TRUST
     2007-6; CREDIT SUISSE FIRST
11   BOSTON MORTGAGE SECURITIES
     CORPORATION; DLJ MORTGAGE
12   CAPITAL, INC.; SELECT
     PORTFOLIO SERVICING, INC.;
13   WELLS FARGO BANK, N.A.;
     MERSCORP HOLDINGS, INC.;
14   MORTGAGE ELECTRONIC
     REGISTRATION SYSTEMS, INC.;
15   QUALITY LOAN SERVICE
     CORPORATION; BLACK KNIGHT
16   FINANCIAL SERVICES, LLC formerly
     known as LENDER PROCESSING
17   SERVICES, INC.; FIDELITY NATIONAL
     FINANCIAL,  INC;  JESSIE BEWLEY;
18   JOSEPH NOEL; CHRISTINA ALLEN;
     SHOUA MOUA; BILL KOCH;
19   KIMBERLY CLARK; VANESSA
     GONZALES; MICHELLE NGUYEN;
20   SAFEGUARD PROPERTIES, LLC;
     ADAM FENN: EARL BEUTLER: EVE
21   BEUTLER; DOES I-XX and ROE
     CORPORATIONS I-XX, inclusive
22   Defendants.

**EXHIBIT LIST OF ATTACHMENTS TO**
23

**FIRST AMENDED COMPLAINT**
24

Exhibit 1: February 1, 2007 Deed of Trust (DOT) signed by Michael Harkey in favor of
25

         New Century Mortgage Corporation nominating Mortgage Electronic Registration
26

         System, Inc. (MERS) as its agent
27

28                                          1

Exhibit 2: July 1, 2008  Notice of Default (NOD) signed by Jessie Bewley, employee of

Lender Processing Services, Inc. (LPS) and notarized by LPS employee, Joseph

Noel prior to signing by Bewley, claiming authority to sign for Quality Loan

Service Corporation (QLSC) and various alternative unnamed entities

Exhibit 3: Partial Transcript of the Grand Jury Testimony of JOSEPH  NOEL regarding

LPS, Day 2, November 15, 2011, pages 71-76 in which he admits that he

he notarized documents before they were signed

Exhibit 4: Substitution of Trustee purportedly signed by LPS employee, Christina Allen,

on July 1, 2008, purportedly notarized by Shoua Moua, on July 7, 2008 and

recorded at the Clark County Recorder on July 11, 2008 in which Allen claims

to be authorized by the bankrupt New Century Mortgage Corporation to substitute

QLSC as Trustee

Exhibit 5: Corporation Assignment of Deed of Trust signed by SPS employee Bill Koch

purporting to be an Assistant Secretary of and notarized by SPS employee

Kimberly Clark purporting to validate the falsely claimed capacity of Koch

as Assistant Secretary of MERS

Exhibit 6: Trustee's Deed Upon Sale executed by QLSC, which was purportedly

substituted as Trustee under the DOT by Exhibit 4

Exhibit 7:  Explanation "MERS" nomination provided to  HARKEY on February 6, 2007

Exhibit 8: Notice of Bankruptcy Filing on January 12, 200 in the United States District

Court for the Western District of Washington in Case No. 09-10180(TTG)

Exhibit 9:  2007-2008 LIBOR panel members from the British Bankers Association

Exhibit 10: December 5, 2011 *Las Vegas Review Journal* Article on Mortgage Fraud

Exhibit 11: January 30, 2013 Settlement Agreement between LPS and 45 State Attorneys

General and for the District of Columbia  in the Connecticut Superior Court for

the Judicial District of Hartford entitled *State of Connecticut v. Lender Processing*

*Services, Inc., et al.*

2

# EXHIBIT 1

Assessor's Parcel Number:
178-19-611-082
Return To:

New Century Mortgage Corp.
Attn: Trailing Docs Department
210 Commerce
Irvine, CA  92602

Prepared By:

Home123 Corporation
22485 Tomball Parkway
Houston, TX 77070

Recording Requested By:

Home123 Corporation
22485 Tomball Parkway
Houston, TX 77070

——————————— [Space Above This Line For Recording Data] ———————————

## DEED OF TRUST   MIN 100431900104102924

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated February 6, 2007                 ,
together with all Riders to this document.

(B) "Borrower" is      MICHAEL HARKEY, A Single Man

Borrower is the trustor under this Security Instrument.

(C) "Lender" is NEW CENTURY MORTGAGE CORPORATION, a California Corporation.

Lender is a Corporation
organized and existing under the laws of California
397-10684687

NEVADA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3029 1/01
WITH MERS

VMP®-6A(NV) (0507)

Page 1 of 15        Initials: MH

VMP Mortgage Solutions, Inc.
(800)521-7291

Lender's address is 18400 Von Karman, Suite 1000, Irvine, CA  92612

**(D)** **"Trustee"** is First American Title Insurance Company

**(E)** **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F)** **"Note"** means the promissory note signed by Borrower and dated February 6, 2007
The Note states that Borrower owes Lender Nine Hundred Sixty Thousand And 00/100
Dollars
(U.S. $960,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than March 1, 2037

**(G)** **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H)** **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☒ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify]: |

**(J)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)** **"Escrow Items"** means those items that are described in Section 3.

**(N)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
397-10684687

Initials: _____

-6A(NV) (0507)                    Page 2 of 15                         Form 3029  1/01

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County          [Type of Recording Jurisdiction] of CLARK                          [Name of Recording Jurisdiction]:

See Exhibit "A" attached hereto and incorporated herein by reference for all purposes.

Parcel ID Number: 178-19-611-082                              which currently has the address of
2220 VILLAGE WALK DRIVE #3315                                                          [Street]
HENDERSON                                              [City], Nevada 89052          [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

397-10684687

VMP-6A(NV) (0507)                      Page 3 of 15                 Initials: _____          Form 3029  1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives

397-10684687

Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

397-10684687

Initials: _YMJ_

VMP ®-6A(NV) (0507)                    Page 6 of 15                    Form 3029   1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

397-10684687

Initials: _____

**VMP-6A(NV)** (0507)                      Page 7 of 15                      Form 3029   1/01

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

Initials: _____

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

397-10684687

VMP®-6A(NV) (0507)                        Page 9 of 15                Initials: _____                Form 3029  1/01

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

397-10684687

Initials: _YK N_

-6A(NV) (0507)                    Page 10 of 15                    Form 3029   1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be

397-10684687

Initials: _____

one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

397-10684687

Initials: _MU_

VMP-6A(NV) (0507)                        Page 12 of 15                        Form 3029  1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option, and without further demand, may invoke the power of sale, including the right to accelerate full payment of the Note, and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold, and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Assumption Fee.** If there is an assumption of this loan, Lender may charge an assumption fee of U.S. $350.00.

397-10684687

Initials: _____

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
MICHAEL HARKEY                     -Borrower

_____

_____ (Seal)
                                  -Borrower

_____ (Seal)     _____ (Seal)
                  -Borrower                                -Borrower

_____ (Seal)     _____ (Seal)
                  -Borrower                                -Borrower

_____ (Seal)     _____ (Seal)
                  -Borrower                                -Borrower

397-10684687

-6A(NV) (0507)                Page 14 of 15                    Form 3029  1/01

STATE OF NEVADA
COUNTY OF CLARK

This instrument was acknowledged before me on _Feb 6, 2007,_ 2007                    by

MICHAEL HARKEY, A Single Man



Mail Tax Statements To:

NOTARY PUBLIC
County of Clark-State of Nevada
NANCY C. RHODY
No. 91-1431-1
My Appointment Expires Jan. 18, 2009

397-10684687

VMP-6A(NV) (0507)                    Page 15 of 15          Initials: _____          Form 3029  1/01

# EXHIBIT 2





**20080701-0002524**

Fee: $15.00
N/C Fee: $25.00

07/01/2008          11:52:49
T20080131107
Requestor:
FIDELITY NATIONAL DEFAULT SOLUTIONS TUS

Debbie Conway              BRT
Clark County Recorder   Pgs: 2

When recorded mail to:

Quality Loan Service Corp.
2141 5th Avenue
San Diego, CA 92101

Space above this line for Recorder's use

TS No.: NV-08-177420-TD          Order # T867318          Loan No.: 0010734127

Assessors Parcel No(s) 178-19-611-082

## Notice of Breach and Default and of Election to Cause Sale of Real Property Under Deed of Trust

NOTICE IS HEREBY GIVEN: That Quality Loan Service Corp. is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated 2/6/2007, executed by MICHAEL HARKEY, A SINGLE MAN, as Trustor, to secure certain obligations in favor of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR NEW CENTURY MORTGAGE CORPORATION, as beneficiary, recorded 2/15/2007, as Instrument No. 20070215-0003557, in Book xxx, Page xxx of Official Records in the Office of the Recorder of CLARK County, Nevada securing, among other obligations including 1 NOTE(S) FOR THE ORIGINAL sum of $960,000.00, that the beneficial interest under such Deed of Trust and the obligations secured thereby are presently held by the undersigned; that a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

Installment of principal and interest plus impounds and advances which became due on 1/1/2008 plus amounts that are due or may become due for the following: late charges, delinquent property taxes, insurance premiums, advances made on senior liens, taxes and/or insurance, trustees fees, and any attorney fees and court costs arising from or associated with beneficiaries effort to protect and preserve its security must be cured as a condition of reinstatement.

That by reason thereof the present Beneficiary under such deed of Trust has executed and delivered to said duly appointed Trustee a written Declaration of Default and Demand for Sale and has deposited with said duly appointed Trustee such Deed of Trust and all documents evidencing obligations secured thereby and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

### NOTICE

You may have the right to cure the default hereon and reinstate the one obligation secured by such Deed of Trust above described. Section NRS 107.080 permits certain defaults to be cured upon the Payment of the amounts required by that statutory section without requiring payment of that portion of principal and interest which would not be due had no default occurred. Where reinstatement is possible, if the default is not cured within 35 days following recording and mailing of this Notice to Trustor or Trustor's successor in interest, the right of reinstatement will terminate and the property may thereafter be sold. The Trustor may have the right to bring a court action to assert the nonexistence of a default or any other defense of Trustor to acceleration and Sale.

Page 1

TS No.: NV-08-177420-TD
Loan No.: 0010734127
Notice of Default
Page 2

**To determine if reinstatement is possible and the amount, if any, to cure the default, contact:**

Select Portfolio Servicing, Inc.
C/O Quality Loan Service Corp.
2141 5th Avenue
San Diego, CA 92101
619-645-7711

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.  Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

Dated: 7/1/2008

Quality Loan Service Corp., AS AGENT FOR BENEFICIARY
BY: Fidelity National Title Insurance Company
FIS DEFAULT SOLUTIONS, AS AGENT

By: _____
JESSE BEWLEY

State of Nevada        ) ss.
County of Clark        )

JESSE BEWLEY

This instrument was acknowledged before me, a notary public, by _____ on
_____, 20___

_____
Notary Public                    JOSEPH NOEL

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
JOSEPH NOEL
Appt. No. 07-3182-1
My Appt. Expires April 14, 2011

If you have previously been discharged through bankruptcy, you may have been released of personal liability for this loan in which case this letter is intended to exercise the note holder's rights against the real property only.

**THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit report agency if you fail to fulfill the terms of your credit obligations.

# EXHIBIT 3

EIGHTH JUDICIAL DISTRICT COURT

CLARK COUNTY, NEVADA

BEFORE THE GRAND JURY IMPANELED BY THE AFORESAID

DISTRICT COURT

THE STATE OF NEVADA,

Plaintiff,

vs.                          No. 11AGJ037AB

GARY TRAFFORD, GERRI SHEPPARD,

Defendants.

**ORIGINAL**

C 277573

Taken at Las Vegas, Nevada

Tuesday, November 15, 2011

8:44 a.m.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

VOLUME 2

Reported by: Danette L. Antonacci, C.C.R. No. 222

---

GRAND JURORS PRESENT ON NOVEMBER 15, 2011

LORNA RAMSEY, Foreperson

CAROL DEGIMAN, Deputy Foreperson (Did not deliberate.)

KATHLEEN BRONSON, Secretary

NORANNE BRUMAGIN, Assistant Secretary

DONALD BAILEY, (Did not deliberate. Moved at 11:45 a.m.)

DANIEL COOK

DENNIS DUNN

RICHARD FAH

LAWRENCE FELDMAN

FERNANDO GARCIA

BYRON GEORGE

MARIO GOMEZ

CHRISTOPHER HALLEN

ROSA HERGY

LARRY SEIBERT

MARGARETE SORRICK

ROBERT WISEMAN

Also present at the request of the Grand Jury:

John Kelleher, Robert Giunta,
San Kern, Helene Lester,
Deputy Attorney General

**FILED**

DEC 12 18 PM '11

CLERK OF THE COURT

C-11-277673-1
TRAN
Reporters Transcript
1708124

---

INDEX OF WITNESSES

|                      | Examined |
| -------------------- | -------- |
| TODD GROSZ           | 6        |
| DEBRA WATKINS        | 12       |
| JENNIFER BLOECKER    | 22       |
| TRACY LAWRENCE       | 54       |
| JOSEPH NOEL          | 71       |
| JOHN SHAFFER         | 81       |
| TARA NEWBERRY        | 90       |

INDEX OF EXHIBITS

| Grand Jury Exhibits | Identified |
| ------------------- | ---------- |
| 1 - PROPOSED INDICTMENT | 124 |
| 18 - CAL-WESTERN RECONVEYANCE CORP DOCUMENTS | 34 |
| 19 - QUALITY LOAN SERVICES CORP DOCUMENTS | 36 |
| 20 - 3 ARCH TRUST, LANDAMERICA DEFAULT SERVICES, ASSET FORECLOSURE SERVICES INC & HOUSEKEY FINANCIAL CORP DOCUMENTS | 40 |
| 22 - CHICAGO DEFAULT SERVICES DOCUMENTS | 55 |
| 23 - AGREEMENT TO COOPERATE-TRACY LAWRENCE | 68 |
| 24 - AGREEMENT TO COOPERATE-MEGHAN BLOECKER SHAW | 69 |
| 25 - AGREEMENT TO COOPERATE-JENNIFER BLOECKER LOWE | 45 |
| 26 - AGREEMENT TO COOPERATE-JOSEPH NOEL | 69 |
| 27 - LOAN DOCUMENTS FROM CHICAGO TITLE | 83 |

69

1    Q.   Is this the agreement to cooperate that you
2  signed with our office?
3    A.   Yes.
4         MR. KELLEHER:  And for the record I'd also
5  at this time like the record to reflect that we've
6  attached as Exhibit 24 the agreement to cooperate for
7  Meghan Shaw who testified last week and Exhibit 26,
8  Joseph Noel, who will be testifying next.
9         THE FOREPERSON:  Additional questions?
10        By law, these proceedings are secret and
11  you are prohibited from disclosing to anyone anything
12  that has transpired before us, including evidence and
13  statements presented to the Grand Jury, any event
14  occurring or statement made in the presence of the Grand
15  Jury, and information obtained by the Grand Jury.
16        Failure to comply with this admonition is a
17  gross misdemeanor punishable by a year in the Clark
18  County Detention Center and a $2,000 fine.  In addition,
19  you may be held in contempt of court punishable by an
20  additional $500 fine and 25 days in the Clark County
21  Detention Center.
22        Do you understand this admonition?
23        THE WITNESS:  Yes.
24        THE FOREPERSON:  Thank you for your
25  testimony.  You are excused.

70

1         THE WITNESS:  Thank you.
2         MR. KELLEHER:  At this time the State would
3  like to call its next witness, Joseph Noel.
4         THE FOREPERSON:  Please remain standing.
5  Please raise your right hand.
6         You do solemnly swear the testimony you are
7  about to give upon the investigation now pending before
8  this Grand Jury shall be the truth, the whole truth, and
9  nothing but the truth, so help you God?
10        THE WITNESS:  So help me God.
11        THE FOREPERSON:  Please be seated.
12        You are advised that you are here today to
13  give testimony in the investigation pertaining to the
14  offenses of notarization of signature of person not in
15  presence of notary public, offering false instruments
16  for filing or recording, false certification on certain
17  Instrument, involving Gary Trafford and Gerri Sheppard.
18        Do you understand this advisement?
19        THE WITNESS:  Yes, I do.
20        THE FOREPERSON:  Please state your first
21  and last name and spell both for the record.
22        THE WITNESS:  My first name is Joseph, my
23  last name is Noel.
24        THE FOREPERSON:  Please spell both for the
25  record.

71

1         THE WITNESS:  J-O-S-E-P-H is the first,
2  last name is N-O-E-L.
3         THE FOREPERSON:  Thank you.
4         Please proceed.
5              JOSEPH NOEL,
6  having been first duly sworn by the Foreperson of the
7  Grand Jury to testify to the truth, the whole truth,
8  and nothing but the truth, testified as follows:
9
10             EXAMINATION
11
12  BY MR. KELLEHER:
13    Q.   Mr. Noel, are you a resident of Las Vegas,
14  Nevada?
15    A.   Yes, I am.
16    Q.   How long have you lived here?
17    A.   My whole life.
18    Q.   And what is the extent of your education?
19    A.   High school diploma.
20    Q.   During the period of -- are you familiar
21  with -- let me ask it this way.  Are you currently
22  employed?
23    A.   No, I'm not.  I'm unemployed.
24    Q.   What was your last employer?
25    A.   My last employer was Workway.  I was laid

72

1  off at the same time around LPS.
2    Q.   So you worked for a company named LPS?
3    A.   Yes, I did.
4    Q.   What time period is that?
5    A.   I began beginning of '07 and I was laid off
6  November 18th of 2010.
7    Q.   Do you know what LPS stands for?
8    A.   Lender Processing Services.
9    Q.   Do you know what kind of company that is?
10    A.   I thought it was a default company.
11    Q.   For foreclosures?
12    A.   Yes.
13    Q.   And how were you hired?  Who hired you?
14    A.   I was working for Fidelity National Title,
15  in the beginning of '05 I was hired and at the end of
16  '07 I was asked if I wanted to go upstairs, there was a
17  job opportunity, they were cutting back in customer
18  service, so I went upstairs and I started around
19  February or March for LPS.
20    Q.   Do you recall the physical address of the
21  office you worked at?
22    A.   500 North Rainbow.
23    Q.   Now you said prior to working for LPS you
24  worked for Fidelity National Title?
25    A.   Yes, I did.

73

```
 1      Q.   Is that also in the same --
 2      A.   Same building.
 3      Q.   Just different floor?
 4      A.   LPS was Suite 300-42, Fidelity National
 5   Title was Suite 100 on the first floor.
 6      Q.   To your knowledge were they separate
 7   companies?
 8      A.   Yes, they were.
 9      Q.   What were you hired to do?  What was your
10   job?
11      A.   I was never given a job title, ever.  What
12   I did was run title, or property profiles, pulled the
13   legal description on the property, run the chain, pull
14   the deed of trust that was in question, and then that's
15   when the customers would send the documents either
16   online or over email and that's how the MODs were set
17   up, I'd match it to a property profile by APN number and
18   address.
19      Q.   Who was your supervisor?
20      A.   My supervisor was Gerri Sheppard.
21      Q.   Did you ever meet Gerri Sheppard
22   personally?
23      A.   Never.
24      Q.   Would you be able to identify her?
25      A.   No.
```

74

```
 1      Q.   During your employment did you ever act in
 2   the capacity of a notary public?
 3      A.   What do you mean?  Can you say that in a
 4   different way?  I don't understand.
 5      Q.   Were you a notary?
 6      A.   Yes, I was.  I became a notary April of
 7   2007.
 8      Q.   And was that something you did on your own
 9   or --
10      A.   No, I did not.  The company sent me down
11   with a check to pay for the notary stamp.  Two weeks
12   later I got the stamp in the mail.
13      Q.   What type -- did you notarize documents for
14   LPS?
15      A.   Only one type of documents, notice of
16   defaults.
17      Q.   When you notarized documents would the
18   person be standing in front of you?
19      A.   Every time the document was signed Jessie
20   Bewley sat 3 feet from me.  The only person that I knew
21   signing my documents.  Deb Watkins I believe did it a
22   couple of times when Bewley was out sick.
23      Q.   Who is Jessie Bewley?
24      A.   He was a searcher who sat in another desk
25   in the same office as me.  There was two of us that sat
```

75

```
 1   in one office and then there was a door and then there
 2   was two other employees that sat in a back office.
 3      Q.   Were you ever asked to sign someone else's
 4   name and notarize it during your employment there?
 5      A.   Now that I think about it I was asked one
 6   time by Gerri Sheppard to sign somebody else's name but
 7   I never did.  I told her I refuse to do it.
 8      Q.   Why did you refuse?
 9      A.   Because I wouldn't do it.  I wasn't forging
10   anybody's name.
11      Q.   You felt that was improper?
12      A.   It was improper, yes, it was.
13      Q.   Did she ever ask you to do it after that?
14      A.   No, she did not.
15      Q.   Are you aware of any other notaries working
16   there that signed documents for Gerri Sheppard?
17      A.   When I was out sick Tracy would, we were
18   the only two notaries in the office, me and Tracy
19   Lawrance, if I was out sick she would help Bewley set up
20   my documents and it was vice versa if she was out sick.
21      Q.   Do you know if Tracy every signed Gerri's
22   name and then notarized it?
23      A.   Not that I know of.
24      Q.   Do you know who Tracy reported to, who her
25   supervisor --
```

76

```
 1      A.   Gary Trafford.  Everybody in the office had
 2   an individual manager.
 3      Q.   Do you know whether Tracy ever signed Gary
 4   Trafford's name and then notarized it?
 5      A.   No, I do not.
 6      Q.   Okay.  But you personally refused to do
 7   that?
 8      A.   Yes, I did.
 9      Q.   Okay.  Are you aware of or have you ever
10   signed notarized documents that had not yet been signed?
11      A.   I would set the documents up.  I was the
12   person who pulled the documents off either email or the
13   web site that LPS provides.  We'd pull it off, I'd set
14   them up, I'd notarize them, I'd sign them, give them to
15   Jessie Bewley.
16      Q.   So it was kind of in reverse then, the
17   notary would happen before the signature?
18      A.   When I got there that's what I was shown.
19   Meghan Bloecker was the one that pretty much showed me
20   how to do my job.  I would set the document up, I would
21   check first APN number, property address, borrower's
22   name, then I would sign it, notarize it and give it to
23   Jessie Bewley to sign.
24      Q.   Was Jessie always right there?
25      A.   Yes, he was.  He was literally as far as me
```

77

```
 1   to her.
 2       Q.   So you personally knew he was signing?
 3       A.   Yes, I did.
 4       Q.   Are you aware of anybody else working there
 5   that was notarizing documents in blank without a
 6   signature?
 7       A.   Not that I know of.
 8       Q.   Can you tell us what your understanding of
 9   the purpose of a notary signature is?
10       A.   To be honest I don't even know.  I mean I
11   was hired in '07, I was provided, I was told to go get a
12   notary stamp.  I was just trying to hold a job for my
13   family.
14       Q.   Do you know what the purpose of an NOD is?
15       A.   To foreclose on a house, start the process.
16       Q.   And the documents that you were notarizing,
17   were they recorded in Clark County?
18       A.   Yes, they were.
19       Q.   Can you kind of describe the process?
20       A.   The process is we'd get -- the whole
21   process?
22       Q.   With respect to what you were doing.
23       A.   I would pull the NOD off the system or pull
24   them out of email, print them to a printer, I would take
25   the property profile or title report, whatever you want
```

78

```
 1   to call it, and match it to the NOD.  Like I said it
 2   would be borrower's name, APN, property address, order
 3   number, all that would have to match before it could
 4   record.  Then I would send it down to the county with a
 5   recorder.  She would take not only my documents of Gerri
 6   Sheppard's unit, she would take Gary Trafford's and
 7   Tracy's documents as well.
 8       Q.   Do you know how many documents per day were
 9   being recorded?
10       A.   Every day was a different day.  It would go
11   from 10 to 200 to 300 between both of our desks.  There
12   was that many documents recording at one time.
13       Q.   Do you recall the name of the clients that
14   you were signing documents for?
15       A.   The only ones I believe I notarized for was
16   Quality Loan Center, California Reconveyance Corporation
17   or Company, and Cal-Western.  Executive and all the
18   other clients had their documents set up ready to
19   record.  They sent it to us ready.  All I did was hand
20   it to the recorder, I never put my finger on it, I just
21   handed it over pretty much.
22       Q.   And after the documents were recorded were
23   copies of those sent back to Gerri Sheppard?
24       A.   There was always a confirmation copy and an
25   original copy.  The original copy would go back to the,
```

79

```
 1   actually the confirmation would go to California, the
 2   originals would go to the county.
 3       Q.   Would the client get a copy as well?
 4       A.   I believe they all had access to the LPS
 5   system.  So what they would go and do is punch in their
 6   order number and they can check under the documents
 7   recorded to see what documents were uploaded and that's
 8   how they know if their documents are recorded.
 9       Q.   The LPS is a computer system?
10       A.   Yes, online .com LPS.  We have a log in.
11            MR. KELLEHER:  I have no further questions.
12   Thank you.
13            THE FOREPERSON:  Jurors, do you have
14   questions for this witness?
15            By law, these proceedings are secret and
16   you are prohibited from disclosing to anyone anything
17   that has transpired before us, including evidence and
18   statements presented to the Grand Jury, any event
19   occurring or statement made in the presence of the Grand
20   Jury, and information obtained by the Grand Jury.
21            Failure to comply with this admonition is a
22   gross misdemeanor punishable by a year in the Clark
23   County Detention Center and a $2,000 fine.  In addition,
24   you may be held in contempt of court punishable by an
25   additional $500 fine and 25 days in the Clark County
```

80

```
 1   Detention Center.
 2            Do you understand this admonition?
 3            THE WITNESS:  Yes, I do.
 4            THE FOREPERSON:  Thank you for your
 5   testimony.  You are excused.
 6            THE WITNESS:  Thank you.
 7            MR. KELLEHER:  At this time the State has
 8   two remaining witnesses, however due to scheduling
 9   conflict neither could be here until 1 o'clock so we
10   would ask to take a lunch break until 1:00.
11            THE FOREPERSON:  Okay.  Thank you.
12            (Recess.)
13            (At this time, Juror Donald Bailey exits
14   the proceedings and is no longer present.)
15            MR. KENN:  State calls John Shaffer.
16            THE FOREPERSON:  Please raise your right
17   hand.
18            You do solemnly swear the testimony you are
19   about to give upon the investigation now pending before
20   this Grand Jury shall be the truth, the whole truth, and
21   nothing but the truth, so help you God?
22            THE WITNESS:  I do.
23            THE FOREPERSON:  Please be seated.
24            You are advised that you are here today to
25   give testimony in the investigation pertaining to the
```

# EXHIBIT 4

‖‖‖ ‖ ‖‖ ‖‖‖ ‖‖‖‖ ‖ ‖ ‖‖‖ ‖‖ ‖ ‖‖ ‖‖‖‖‖ ‖‖ ‖‖
20080711-0002748
Fee: $15.00    RPTT: $0.00
N/C Fee: $25.00
07/11/2008      13:02:00
T20080140794
Requestor:
  LSI TITLE AGENCY INC.
Debbie Conway        MSH
Clark County Recorder    Pgs: 2

Recording requested by:

When recorded mail to:

Quality Loan Service Corp.
2141 5th Avenue
San Diego, CA 92101
619-645-7711

178-19-611-082

Space above this line for recorders use

TS # NV-08-177420-TD          Order # T867318          Loan # 0010734127
MERS MIN No.:                                          Investor No. 412444591
100431900104102924

## Substitution of Trustee

WHEREAS, MICHAEL HARKEY, A SINGLE MAN was the original Trustor, FIRST AMERICAN TITLE INSURANCE COMPANY was the original Trustee, and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR NEW CENTURY MORTGAGE CORPORATION was the original Beneficiary under that certain Deed of Trust dated 2/6/2007 and recorded on 2/15/2007 as Instrument No. 20070215-0003557, in book xxx, page xxx of Official Records of CLARK County, NV; and

WHEREAS, the undersigned is the present Beneficiary under said Deed of Trust, and

WHEREAS, the undersigned desires to substitute a new Trustee under said Deed of Trust in place and stead of said original Trustee, or Successor Trustee, thereunder, in the manner provided for in said Deed of Trust,

NOW, THEREFORE, the undersigned hereby substitutes QUALITY LOAN SERVICE CORPORATION, as Trustee under said Deed of Trust.

Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

Page 1

Substitution of Trustee - NV
TS # NV-08-177420-TD
Page 2

Dated: 7/1/2008

U.S. Bank National Association, as trustee, on behalf of
the holders of the CSMC Mortgage-Backed Pass-Through
Certificates, Series 2007-6 by Select Portfolio Servicing,
Inc., its Attorney in Fact

By: CHRISTINA ALLEN   Duly Appointed Officer

State of MN          ) ss

County of Dakota     )

On 7/7/08 before me, _____ the undersigned Notary Public,
personally    appeared         CHRISTINA ALLEN
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the
same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.                              (Seal)

Signature

SHOUA MOUA
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2012

# EXHIBIT 5

Assessor's/Tax ID No. 178-19-611-082

Recording Requested By:
SELECT PORTFOLIO SERVICING, INC.

When Recorded Return To:
BILL KOCH
SELECT PORTFOLIO SERVICING, INC.
3815 SW TEMPLE
SALT LAKE CITY, UT 84115

**20080806-0000687**
Fee: $15.00    RPTT: $0.00
N/C Fee: $25.00
08/06/2008        08:28:59
T20080167928
Requestor:
  LSI TITLE AGENCY INC.
Debbie Conway          DBX
Clark County Recorder   Pgs: 2

NV-08-177420-TD
APN-178-19-611-082
T867318

## CORPORATE ASSIGNMENT OF DEED OF TRUST

Clark, Nevada    **SELLER'S SERVICING #: 0010734127    "HARKEY"**
INVESTOR #:
MERS #: 100431900104102924

THE UNDERSIGNED DOES HEREBY AFFIRM THAT THIS DOCUMENT SUBMITTED FOR
RECORDING DOES NOT CONTAIN A SOCIAL SECURITY NUMBER.

Date of Assignment: July 18th, 2008
Assignor: MERS AS NOMINEE FOR NEW CENTURY MORTGAGE CORPORATION at 3815 SW
TEMPLE, SALT LAKE CITY, UT 84115
Assignee: U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE
HOLDERS OF THE CSMC MORTGAGE-BACKED PASS-THROUGH CERTIFICATES, SERIES
2007-6 BY SELECT PORTFOLIO SERVICING, INC., ITS ATTORNEY IN FACT  at 3815 SW
TEMPLE, SALT LAKE CITY, UT 84115

Executed By: MICHAEL HARKEY, A SINGLE MAN  To: MERS AS NOMINEE FOR NEW
CENTURY MORTGAGE CORPORATION, A CALIFORNIA CORPORATION
Date of Deed of Trust: 02/06/2007 Recorded: 02/15/2007 as Instrument No.: 20070215-0003557  In
Clark,  Nevada

Assessor's/Tax ID No. 178-19-611-082

Property Address: 2220 VILLAGE WALK DRIVE #3315, HENDERSON, NV 89052

   KNOW ALL MEN BY THESE PRESENTS that in consideration of the sum of TEN and NO/100ths
DOLLARS and other good and valuable consideration, paid to the above named Assignor, the receipt and
sufficiency of which is hereby acknowledged, said Assignor hereby assigns unto the above-named
Assignee, the said Deed of Trust together with the Note or other evidence of indebtedness (the "Note"),
said Note having an original principal sum of $960,000.00 with interest, secured thereby, together with all
moneys now owing or that may hereafter become due or owing in respect thereof, and the full benefit of
all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby
grants and conveys unto the said Assignee, the Assignor's beneficial interest under the Deed of Trust.

CORPORATE ASSIGNMENT OF DEED OF TRUST Page 2 of 2

TO HAVE AND TO HOLD the said Deed of Trust and Note, and also the said property unto the said Assignee forever, subject to the terms contained in said Deed of Trust and Note.  IN WITNESS WHEREOF, the assignor has executed these presents the day and year first above written:

MERS AS NOMINEE FOR NEW CENTURY MORTGAGE CORPORATION

On _____ JUL 2 8 2008

By: _____

Bill Koch, Assistant Secretary

STATE OF UTAH
COUNTY OF Salt Lake

On JUL 2 8 2008 _____, before me, KIMBERLY CLARK, a Notary Public in and for Salt Lake in the State of Utah, personally appeared Bill Koch, Assistant Secretary , MERS AS NOMINEE FOR NEW CENTURY MORTGAGE CORPORATION personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_____

KIMBERLY CLARK
Notary Expires: 12/11/2011

NOTARY PUBLIC
KIMBERLY CLARK
3815 South 92 West
Salt Lake City, Utah 84115
My Commission Expires
December 11, 2011
STATE OF UTAH

(This area for notarial seal)

Mail Tax Statements To: MICHAEL HARKEY, 2220 VLG WALK DR 3315, HENDERSON, NV 89052

# EXHIBIT 6

Trustee's Deed Upon Sale
Page 2

Recording requested by:

When recorded mail to:

U.S. Bank National Association
3815 S.W. Temple
Salt Lake City, UT 84115-4412

Forward tax statements to the address given above

20090116-0000863
Fee: $17.00    RPTT: $5,426.40
N/C Fee: $25.00
01/16/2009        09:11:24
T20090016786
Requestor:
 FIDELITY NATIONAL DEFAULT SO
Debbie Conway        DBX
Clark County Recorder    Pgs: 5

_____
Space above this line for recorders use only

TS #
NV-08-177420-TD

Order # T867318

Loan # 0010734127

# Trustee's Deed Upon Sale

A.P.N.: **178-19-611-082**

Transfer Tax: **$5,426.40**

The undersigned grantor declares:
The grantee herein IS the foreclosing beneficiary.
The amount of the unpaid debt together with costs was:      $1,063,633.71
The amount paid by the grantee at the trustee sale was:     $1,063,633.71
The documentary transfer tax is:                            $5,426.40
Said property is in the City of: HENDERSON, County of CLARK

**QUALITY LOAN SERVICE CORPORATION**, as Trustee, (whereas so designated in the Deed of Trust hereunder more particularly described or as duly appointed Trustee) does hereby **GRANT** and **CONVEY** to

**U.S. Bank National Association, as trustee, on behalf of the holders of the CSMC Mortgage-Backed Pass-Through Certificates, Series 2007-6**

(herein called Grantee) but without covenant or warranty, expressed or implied, all right title and interest conveyed to and now held by it as Trustee under the Deed of Trust in and to the property situated in the county of  **CLARK**, State of Nevada, described as follows:
**See Attached**

This conveyance is made in compliance with the terms and provisions of the Deed of Trust executed by   **MICHAEL HARKEY, A SINGLE MAN**, as trustor, dated 2/6/2007,  and recorded on
2/15/2007 as instrument number **20070215-0003557**, in Book xxx, Page xxx of Official Records in the office of the Recorder of  **CLARK**, Nevada, under the authority and powers vested in the Trustee designated in the Deed of Trust or as the duly appointed trustee, default having occurred under the Deed of Trust pursuant to the Notice of Breach and Election to Sell under the Deed of Trust recorded on 7/1/2008, instrument no **20080701-0002524**, Book , Page , of Official records. Trustee having complied with all applicable statutory requirements of the State of Nevada and performed all duties required by the Deed of Trust including sending a Notice of Default and Election to Sell within ten days after its recording and a Notice of Sale at least twenty days prior to the Sale Date by certified mail, postage pre-paid to each person entitled to notice in compliance with Nevada Revised Statute 107.050.

Trustee's Deed Upon Sale
Page 2

Default occurred as set forth in a Notice of Breach and Election to Sell which was recorded in the office of the Recorder of said County.

All requirements of law regarding the mailing of copies of notices or the publication of a copy of the Notice of Breach and Election to Sell or the personal delivery of the copy of the Notice of Breach and Election to Sell and the posting and publication of copies of the Notice of Sale have been complied with.

Said property was sold by said Trustee at public auction on **1/12/2009** at the place named in the Notice of Sale, in the County of **CLARK,** Nevada, in which the property is situated. Grantee, being the highest bidder at such sale, became the purchaser of said property and paid therefore to said trustee the amount being **$1,063,633.71** in lawful money of the United States, or by the satisfaction, pro tanto, of the obligations then secured by said Deed of Trust.

Date: **1/13/2009**                    **QUALITY LOAN SERVICE CORPORATION**

By: _____

**Vanessa Gonzales, Assistant Secretary**

State of California    )
County of San Diego)

On **1/14/09** before me, **Michelle Nguyen** a notary public, personally appeared **Vanessa Gonzales,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____   (Seal)
                **Michelle Nguyen**

MICHELLE NGUYEN
COMM. #1665032
NOTARY PUBLIC ● CALIFORNIA
SAN DIEGO COUNTY
Comm. Exp. MAY 8, 2010

THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

EXHIBIT 7

DATE:        February 6, 2007
BORROWER:    MICHAEL HARKEY

CASE #:
LOAN #:      397-10684687
PROPERTY ADDRESS: 2220 VILLAGE WALK DRIVE #3315, HENDERSON, NV  89052

## DISCLOSURE STATEMENT ABOUT MERS

Mortgage Electronic Registration Systems, Inc. (MERS) is named on your mortgage as the mortgagee in a nominee capacity for <u>NEW CENTURY MORTGAGE CORPORATION</u> (Lender).  MERS is a company separate from your lender that operates an electronic tracking system for mortgage rights.  MERS is not your lender; it is a company that provides an alternative means of registering the mortgage lien in the public records.  MERS maintains a database of all the loans registered with it, including the name of the lender on each loan. Your lender has elected to name MERS as the mortgagee in a nominee capacity and record the mortgage in the public land records to protect its lien against your property.

**Naming MERS as the mortgagee and registering the mortgage on the MERS electronic tracking system does not affect your obligation to your Lender, under the Promissory Note.**


MICHAEL HARKEY

EXHIBIT 8

United States Bankruptcy Court
Western District of Washington

## Notice of Bankruptcy Case Filing



A bankruptcy case concerning the debtor(s) listed
below was filed under Chapter 13 of the United States
Bankruptcy Code, entered on 01/12/2009 at 10:50 AM
and filed on 01/12/2009.

**Michael Eugene Harkey**
48 Thunder Road
Camano Island, WA 98212
SSN: xxx-xx-7804

The bankruptcy trustee is:

**K Michael Fitzgerald**
600 University St #2200
Seattle, WA 98101
206-624-5124

The case was assigned case number 09-10180-TTG to Judge Thomas T. Glover.

In most instances, the filing of the bankruptcy case automatically stays certain collection and other
actions against the debtor and the debtor's property. Under certain circumstances, the stay may be
limited to 30 days or not exist at all, although the debtor can request the court to extend or impose a
stay. If you attempt to collect a debt or take other action in violation of the Bankruptcy Code, you may
be penalized. Consult a lawyer to determine your rights in this case.

If you would like to view the bankruptcy petition and other documents filed by the debtor, they are
available at our *Internet* home page http://www.wawb.uscourts.gov/ or at the Clerk's Office, 700 Stewart
St, Room 6301, Seattle, WA 98101 or 1717 Pacific Avenue, Suite 2100, Tacoma, WA 98402.

You may be a creditor of the debtor. If so, you will receive an additional notice from the court setting
forth important deadlines.

**Mark L. Hatcher**
**Clerk, U.S. Bankruptcy**
**Court**

# EXHIBIT 9

# Treasury and Finance Info

**Home**     **Headlines**     **Market Reports**     **Actual Markets**     **Historical Market Data** ▾     **Newsletter**

> › Home › BBA LIBOR PANELS 2007 / 2008

## BBA LIBOR PANELS 2007 / 2008

🔒 Written By: British Bankers Association (BBA)     🕑 7-1-2007     🗋 Categorized in: Benchmarks

With effect from Monday, 25 June 2007, the composition of the Australian Dollar (AUD), Canadian Dollar (CAD), Swiss Franc (CHF), Danish Krone (DKK), Euro (EUR), Sterling (GBP), Japanese Yen (JPY), New Zealand Dollar (NZD), Swedish Krona (SEK) and US Dollar (USD) will be as follows:

**AUSTRALIAN DOLLAR (AUD) - 8 BANKS**

Barclays

Bankplc
Commonwealth Bank of Australia
Deutsche Bank AG
HBOS
Lloyds TSB Bank plc
National Australia Bank Ltd
The Royal Bank of Scotland Group
UBS AG

**CANADIAN DOLLAR (CAD) - 12 BANKS**

Bank of Montreal
Barclays Bank plc
Canadian Imperial Bank of Commerce
Deutsche Bank AG
HSBC
HBOS
JP Morgan Chase
Lloyds TSB Bank plc
National Bank of Canada
Rabobank
Royal Bank of Canada
The Royal Bank of Scotland Group

**SWISS FRANC (CHF) - 12 BANKS**

Barclays Bank plc
Bank of Tokyo - Mitsubishi UFJ
Citibank NA
Credit Suisse
Deutsche Bank AG
HSBC
JP Morgan Chase
Lloyds TSB Bank plc
Société Générale
The Royal Bank of Scotland Group
UBS AG

West LB AG

**DANISH KRONE (DKK) - 8 BANKS**

Barclays Bank plc
Deutsche Bank AG
HSBC
JP Morgan Chase
Lloyds TSB Bank plc
Rabobank
The Royal Bank of Scotland Group
UBS AG

**EURO (EUR) - 16 BANKS**

Bank of America
Barclays Bank plc
Bank of Tokyo - Mitsubishi UFJ
Citibank NA
Credit Suisse
Deutsche Bank AG
HBOS
HSBC
JP Morgan Chase
Lloyds TSB Bank plc
Rabobank
Royal Bank of Canada
Société Générale
The Royal Bank of Scotland Group
UBS AG
West LB AG

**STERLING (GBP) - 16 BANKS**

Abbey National plc
Bank of America
Bank of Tokyo - Mitsubishi UFJ
BNP Paribas
Barclays Bank plc
Citibank NA
Deutsche Bank AG
HBOS
HSBC
JP Morgan Chase
Lloyds TSB Bank plc
Rabobank
Royal Bank of Canada
The Royal Bank of Scotland Group
UBS AG
West LB AG

**JAPANESE YEN (JPY) - 16 BANKS**

Bank of America

Bank of Tokyo - Mitsubishi UFJ
Barclays Bank plc
Citibank NA
Deutsche Bank AG
HSBC
JP Morgan Chase
Lloyds TSB Bank plc
Mizuho Corporate Bank
Rabobank
Société Générale
Sumitomo Mitsui Banking Corporation Europe Ltd (SMBCE)
The Norinchukin Bank
The Royal Bank of Scotland Group
UBS AG
West LB AG

**NEW ZEALAND DOLLAR (NZD) - 8 BANKS**

Commonwealth Bank of Australia
Barclays Bank plc
Deutsche Bank AG
HSBC
JP Morgan Chase
Lloyds TSB Bank plc
National Australia Bank
The Royal Bank of Scotland Group

**SWEDISH KRONA (SEK) - 8 BANKS**

Barclays Bank
Deutsche Bank
HSBC
JP Morgan Chase
Lloyds TSB Bank plc
Rabobank
The Royal Bank of Scotland Group
UBS

**US DOLLAR (USD) - 16 BANKS**

Bank of America
Bank of Tokyo - Mitsubishi UFJ
Barclays Bank plc
Citibank NA
Credit Suisse
Deutsche Bank AG
HBOS
HSBC
JP Morgan Chase
Lloyds TSB Bank plc
Rabobank
Royal Bank of Canada
The Norinchukin Bank
The Royal Bank of Scotland Group
UBS AG

West LB AG

WWW.TREASURYANDFINANCE.INFO

SOURCE:

British Bankers' Association BBA, London, 1 July 2007, WWW.BBA.ORG.UK

**Comments (0)**

›  Change your comment display settings

Post a Comment (show)

**Copyright 2007 – 2010 Treasury and Finance Info and / or authors**

All rights reserved. Website powered by  Riskmatrix

# EXHIBIT 10



‹ Three suspects charged in...          Whittemore, Seeno brothers... ›

**Posted** December 5, 2011 - 1:25pm

# Three more Nevada notaries charged in foreclosure fraud case

**By KEN RITTER THE ASSOCIATED PRESS**

Three more Nevada notaries are accused of falsely attesting to legal signatures on foreclosure documents in a Las Vegas-area mortgage fraud scheme that has led to the indictment of two Southern California title officers, the state attorney general's office said Monday.

The announcement that Meghan Shaw, Jennifer Lowe and Joseph Noel each face one charge of notarizing a signature of a person not in their presence came a week after Tracy Lawrence, the first notary identified as a witness in the "robo-signing" case, was found dead at home after missing sentencing on a similar charge.

The charge is a gross misdemeanor and carries up to a year in jail and a $2,000 fine. Court records filed Wednesday refer to Lowe as Jennifer Bloecker.

Each of the three, like Lawrence, testified before a grand jury that handed up a more than 600-count indictment accusing Geraldine Ann Sheppard, 62, of Santa Ana, Calif., and Gary Randall Trafford, 49, of Irvine, Calif., of heading a scheme that led to the filing of tens of thousands of fraudulent foreclosure documents in Las Vegas between 2005 and 2008.

Sheppard and Trafford are employees of a publicly traded company, Lender Processing Services Inc., based in Jacksonville, Fla., that provides technology and services to major banks. Noel formerly worked for the company.

The indictment alleged that Sheppard and Trafford directed employees to notarize forged signatures on documents filed with the Clark County recorder's office to start home foreclosures.

Nevada has been the state hit hardest by the recession and the housing crisis, leading the nation in bankruptcies, foreclosures and unemployment.

Lender Processing Services officials declined to comment Monday about Nevada Attorney General Catherine Cortez Masto's announcement that more notaries were cooperating with the prosecution.

President and CEO Hugh Harris issued a statement last month acknowledging flaws in signing procedures on some documents, but the company said it thought documents were properly authorized and their recording didn't result in a wrongful foreclosure.

‹ Three suspects charged in...          Whittemore, Seeno brothers... ›

**From the Web**                                    Sponsored Content by Taboola



**The Side Of Vegas You Never See**
CNBC



**14 Benefits Most Seniors Didn't Know They Had**
Newsmax



**Homeowners May Be In for a Rude Awakening...**
Smart Life Weekly

Most Viewed | Popular | Comments

Friend: Las Vegas man with 132-pound scrotum was 'trapped...

Astronauts go 'Live from Space' in National Geographic...

Aztecs put Rebels on ice, ending imploding UNLV's NCAA hopes

A downtown feud could force limits on Fremont Street booze...

Las Vegas police look for suspect in shooting that led to...

Toronto mayor Ford slams 'House of Cards' actor Kevin Spacey

**❚ Rules for posting comments**

Comments posted below are from readers. In no way do they represent the view of Stephens Media LLC or this newspaper. This is a public forum. Read our guidelines for posting. If you believe that a commenter has not followed these guidelines, please click the FLAG icon next to the comment.

**CALENDAR**



**All Night Happy Hour in Las...**
Monday, Mar 17, 5:00 pm
Via Brasil Steakhouse in Summerlin, Las Vegas

**Karen Drucker In Concert**
Sunday, Mar 23, 2:00 pm
The Las Vegas Center for Spiritual..., Las Vegas



**Vegas Loves Brazil Festival...**
Saturday, Apr 5, 11:00 am
Rio Las Vegas Hotel & Casino, Las Vegas

| 16 Sun | 17 Mon | 18 Tue | 19 Wed | 20 Thu | 21 Fri | 22 Sat | All events |

**From the Web**

Sponsored Content by Taboola



**The Side Of Vegas You Never See**
CNBC



**14 Benefits Most Seniors Didn't Know They Had**
Newsmax



**Homeowners May Be In for a Rude Awakening...**
Smart Life Weekly

## COLUMNISTS



**RON KANTOWSKI**
Andy McMillin wins Mint 400 in a
cloud of dust



**RJ GOES TO A PARTY**
Junior League honors two for
community service



**CHRISTOPHER LAWRENCE**
George Wallace revives acting career -
in women's roles



**STEVEN KALAS**
Love happens in a flash; keeping it
gets tricky






**Connect**
- Contacts
- Letter to the Editor
- Jobs at the RJ
- Feedback
- Submit a News Tip

**Services**
- Subscribe
- Manage subscription
- Put the paper on hold
- Report a delivery problem
- eNewsletter Sign Up

**Solutions**
- Advertise with us
- Place a classified ad
- How to link to the RJ
- FAQs

**Follow Us**
- Facebook
- Twitter
- Google+
- Pinterest
- RSS Feed

Copyright © Stephens Media LLC 2014. All rights reserved. • Privacy Policy

# EXHIBIT 11

Return Date: February 19, 2013

| | | |
|---|---|---|
| STATE OF CONNECTICUT | : | SUPERIOR COURT |
|     *Plaintiff* | : | |
| | : | JUDICIAL DISTRICT OF |
| | : | HARTFORD |
| | : | |
|     v. | : | |
| | : | |
| | : | |
| LENDER PROCESSING SERVICES, INC. | : | |
| a Delaware Corporation; LPS DEFAULT | : | |
| SOLUTIONS, INC., a Delaware Corporation, | : | |
| and DOCX, LLC, a Georgia Limited Liability | : | |
| Company, | : | |
|     *Defendants* | : | JANUARY 31, 2013 |

## JOINT STIPULATION TO ENTRY OF FINAL JUDGMENT

It is stipulated between Plaintiff State of Connecticut, represented by Attorney

General George Jepsen, acting at the request of William M. Rubenstein, Commissioner

of the Department of Consumer Protection of the State of Connecticut , and Defendants

Lender Processing Services, Inc., LPS Default Solutions, Inc., and DocX, LLC

(hereinafter collectively referred to as "LPS" or "Defendants") that a Stipulated

Judgment may enter in the form hereinafter set forth, attached hereto, and incorporated

herein, upon motion of any party, without any further notice.

PLAINTIFF
STATE OF CONNECTICUT

GEORGE JEPSEN
ATTORNEY GENERAL

DATE: 1/30/13

BY: _____
Joseph J. Chambers (Juris No. 430258)
Assistant Attorney General

1

55 Elm Street, P.O. Box 120
Hartford, CT  06141-0120
Telephone: (860) 808-5270
Fascimile:   (860) 808-5385
Email:  joseph.chambers@ct.gov


DEFENDANTS
LENDER PROCESSING SERVICES,
INC., LPS DEFAULT SOLUTIONS,
INC., and DOCX, LLC

DATE: 1/30/13

BY: _____

Robert M. Langer
Wiggin and Dana LLP
One CityPlace
185 Asylum Street
Hartford CT 06103-3402
Telephone: (860) 297-3724
Facsimile: (860) 525-9380
Email:  rlanger@wiggin.com
Juris No. 67700

**CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed, first class postage prepaid, this 31st day of January 2013 to:

> Robert M. Langer
> Wiggin and Dana LLP
> One CityPlace
> 185 Asylum Street
> Hartford CT 06103-3402
> Telephone: (860) 297-3724
> Facsimile: (860) 525-9380
> Email:  rlanger@wiggin.com
> Juris No. 67700

Joseph J. Chambers
Assistant Attorney General

3

Return Date: February 19, 2013

| | | |
|---|---|---|
| STATE OF CONNECTICUT | : | SUPERIOR COURT |
|     *Plaintiff* | : | |
| | : | JUDICIAL DISTRICT OF |
| | : | HARTFORD |
| | : | |
|     v. | : | |
| | : | |
| | : | |
| LENDER PROCESSING SERVICES, INC. | : | |
| a Delaware Corporation; LPS DEFAULT | : | |
| SOLUTIONS, INC., a Delaware Corporation, | : | |
| and DOCX, LLC, a Georgia Limited Liability | : | |
| Company, | : | |
|     *Defendants* | : | JANUARY 31, 2013 |

## STIPULATED JUDGMENT

Plaintiff State of Connecticut, represented by Attorney General George Jepsen, acting at the request of William M. Rubenstein, Commissioner of the Department of Consumer Protection of the State of Connecticut, and Defendants Lender Processing Services, Inc., LPS Default Solutions, Inc., and DocX, LLC (hereinafter collectively referred to as "LPS" or "Defendants"), have filed a written Stipulation, filed herewith, that judgment be entered as set forth herein.  Therefore, upon consideration of the papers filed and consent of the parties hereto, it is hereby ORDERED and ADJUDGED as follows:

I.      **JURISDICTION**

This Court has jurisdiction over the subject matter of this action and the parties hereto.  This same day, Plaintiff has filed a Complaint for Injunctive and Other Statutory

1

Relief (the "Complaint") against LPS pursuant to the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. Conn. Gen. Stat.42-110a *et seq.*

## II.   GENERAL PROVISIONS

### 2.1   Agreement

The State and LPS are represented by counsel and have agreed on a basis for settlement of the matters alleged in the Complaint. The parties agree to entry of this Stipulated Judgment (hereinafter "Judgment") without the need for trial, discovery in this action, or adjudication of any issue of law or fact.  Defendants enter into this Judgment freely and without coercion, and without admitting any violation of the law.  Defendants acknowledge that they are able to abide by the provisions of this Judgment. Defendants further acknowledge that a violation of this Judgment may result in additional relief pursuant to Conn. Gen. Stat.42-110a *et seq.*

### 2.2   Definitions

a.    "**Attesting Documents**" shall mean affidavits and similar sworn statements making various assertions relating to a mortgage loan, such as the ownership of the mortgage note and mortgage or deed of trust, the amount of principal and interest due, and the fees and expenses chargeable to the borrower.

b.    "**Covered Conduct**" shall mean LPS' practices related to mortgage default servicing, including document creation, preparation, execution, recordation, and notarization practices as they relate to Mortgage Loan Documents as well as LPS' relationships with attorneys representing the Servicers and other third parties through the Effective Date of this Judgment.

c.    "**Effective Date**" shall mean the date on which a copy of this Judgment, duly executed by Defendants and by the Signatory Attorney General, is approved by and becomes a Judgment of the Court.

d.    "**Federal Banking Agencies**" shall mean the Board of Governors of the Federal Reserve System, The Federal Deposit Insurance Corporation, The Office of the Comptroller of the Currency, and the Office of Thrift Supervision.

e.    "**Investigating Attorneys General**" shall mean the Attorneys General of the States of Arizona, California, Connecticut, Florida, Illinois, Iowa, Oregon, New Jersey, North Carolina, Pennsylvania, South Carolina, Texas, and Washington.

f.    "**LPS**" shall mean Defendants Lender Processing Services, Inc.; LPS Default Solutions, Inc.; and DocX, LLC, including all of their parents, subsidiaries, and divisions.

g.    "**Mortgage Loan Documents**" shall mean (i) Attesting Documents; (ii) assignments of mortgages or deeds of trust or notes; (iii) mortgage or deed of trust lien releases and satisfactions; (iv) notices of trustee sale; (v) notices of breach or default; and (vi) other mortgage-related documents that are required for statutory, non-judicial foreclosure or foreclosure-related documents filed with a state court or in connection with a federal bankruptcy proceeding.

h.    "**Parties**" shall mean LPS, the State, and the Signatory Attorney General.

i.    "**Servicer**" shall mean any residential mortgage loan servicing entity to which LPS provides technology and/or other services relating to mortgages in default.

j.    "**Signatory Attorney General**" shall mean Attorney General George Jepsen, or his authorized designee, who has agreed to this Judgment.

3

2.3   **Stipulated Facts**

The Investigating Attorneys General conducted investigations regarding certain business practices relating to the Covered Conduct.  The Investigating Attorneys General found and the Defendants stipulate to the following facts of the investigation:

a.    During a period from at least January 1, 2008, to December 31, 2010, certain Servicers authorized specific persons employed by certain subsidiaries of Lender Processing Services, Inc., to sign Mortgage Loan Documents or assist with the execution of Mortgage Loan Documents on their behalf.

b.    Some Mortgage Loan Documents generated and/or executed by certain subsidiaries of Lender Processing Services, Inc., on behalf of Servicers contain defects including, but not limited to, unauthorized signatures, improper notarizations, or attestations of facts not personally known to or verified by the affiant.  Some of these Mortgage Loan Documents may contain unauthorized signatures or may contain inaccurate information relating to the identity, location, or legal authority of the signatory, assignee, or beneficiary or to the effective date of the assignment.

c.    Certain subsidiaries of Lender Processing Services, Inc., recorded or caused to be recorded Mortgage Loan Documents with these defects in local land records offices or executed or facilitated execution on behalf of the Servicers knowing some of these Mortgage Loan Documents would be filed in state courts or used to comply with statutory, non-judicial foreclosure processes.

d.    At some time prior to November 1, 2009, employees and agents of DocX, LLC ("DocX") a wholly owned, indirect subsidiary of Lender Processing Services, Inc., were directed by management of DocX to initiate and implement a program under which

4

some DocX employees signed Mortgage Loan Documents in the name of other DocX employees, who were or had been at one time authorized to sign on behalf of Servicers. DocX referred to these unauthorized signers as "Surrogate Signers."

e.     At the time the Surrogate Signers signed certain Mortgage Loan Documents, they were not authorized by the applicable Servicer to sign their own names or the names of those persons who had purportedly been authorized by the Servicer to sign the Mortgage Loan Documents in question.

f.     The Surrogate Signers executed certain Mortgage Loan Documents in the name of other DocX employees without indicating that the documents had been signed by a Surrogate Signer.

g.     Notaries public employed by DocX or as agents of DocX completed the notarial statements on the Mortgage Loan Documents that were executed by Surrogate Signers and stated that those documents had been properly acknowledged, signed, and affirmed in their presence by the person whose name appeared on the document when in fact the Surrogate Signer had signed the name of another person or signed outside the presence of the notary, or both.

h.     DocX presented and recorded certain Mortgage Loan Documents with local land records offices knowing they had been executed by Surrogate Signers.

i.     On or around November 2009, Lender Processing Services, Inc., conducted an internal review of DocX and identified certain Mortgage Loan Documents that contained inaccuracies, unauthorized signatures, notarization defects, or other deficiencies.  Lender Processing Services, Inc., has also identified certain other defects and deficiencies in the Mortgage Loan Documents executed by some of its other

5

subsidiaries.  Such past practices, when discovered by Lender Processing Services, Inc., management, were discontinued.

j.      On April 13, 2011, LPS entered into a Consent Order with Federal Banking Agencies, which order contains similar allegations of deficiencies in Mortgage Loan Document execution practices at certain subsidiaries of LPS and management oversight of these practices.  Pursuant to the Consent Order, LPS has agreed to take further remedial action, including, but not limited to, proposing a plan to enhance internal auditing and risk management, adopting a comprehensive compliance program for activities relating to default management services, and retaining an independent consultant to conduct an independent review of LPS' document execution services occurring between January 1, 2008, and December 31, 2010, to determine the existence and extent of the deficiencies and to assess LPS' ability to identify affected Mortgage Loan Documents, to remediate the deficiencies, as appropriate, and to assess whether any financial injury to Servicers or borrowers resulted from the document execution services described herein. To the extent the independent consultant identifies any such financial harm, LPS has agreed to prepare a remediation plan under the Consent Order that will, as appropriate, address reimbursement to those borrowers for any such financial injury.

2.4     **Preservation of Law Enforcement Action**

Nothing herein precludes the Signatory Attorney General from enforcing the provisions of this Judgment, or from pursuing any law enforcement action with respect to the acts or practices of Defendants not covered by this Judgment or any acts or practices of Defendants conducted after the entry of this Judgment. The fact that such

conduct is not expressly prohibited by the terms of this Judgment shall not be a defense to any such enforcement action.

2.5   **Compliance with State and Federal Law**

Nothing herein relieves Defendants of their duty to comply with applicable laws of the State and all federal or local laws, regulations, ordinances, and codes, nor constitutes authorization by the Signatory Attorney General for the Defendants to engage in acts or practices prohibited by such laws.  If, subsequent to the Effective Date of this Judgment, any state, local, or federal law is enacted or regulation promulgated with respect to the Covered Conduct of this Judgment and Defendants intend to comply with the newly enacted legislation or regulation and that compliance may create a conflict with the terms of this Judgment, Defendants shall notify the Signatory Attorney General of this intent.  If the Attorney General agrees, the Attorney General shall consent to a modification for the purpose of eliminating the conflict.  The Attorney General agrees that consent to modify is appropriate if any conduct prohibited by this Judgment is required by State, local, or federal law or regulation, or if conduct required by this Judgment is prohibited by such State, local, or federal law or regulation. The Attorney General will give each request to modify based on a change in the applicable law reasonable consideration and will respond to the Defendant(s) within 90 days.  Nothing herein is intended to preclude Defendants from seeking modification of this Judgment if the Attorney General does not consent to the request of the Defendant(s).

7

2.6 **Non-Approval of Conduct**

Nothing herein constitutes approval by the Signatory Attorney General of LPS' past or future practices.  LPS shall not make any representation to the contrary.

2.7 **Release**

The Signatory Attorney General hereby releases and discharges LPS and each and all current and former officers, shareholders, and employees from civil or administrative claims that his or her State has or may have had against them under Conn. Gen. Stat. Conn. Gen. Stat.42-110a *et seq.,* including claims for damages, fines, injunctive relief, remedies, sanctions, or penalties resulting from the Covered Conduct on or before the Effective Date (collectively, the "Released Claims").  Nothing herein shall be construed as a waiver or release of any private rights, causes of action, or remedies of any person against the Defendants with respect to the Covered Conduct.

2.8 **Evidentiary Effect of this Judgment**

This Judgment is not and shall not in any event be construed, deemed to be, and/or used as an admission or evidence of the validity of any claim that the Signatory Attorney General has or could assert against LPS, or an admission of any alleged wrongdoing or liability by LPS in any civil, criminal, or administrative court, administrative agency, or other tribunal anywhere in the country.  The agreement of LPS to comply with the provisions of this Judgment is not an admission that LPS ever engaged in any activity contrary to any law.  Moreover, by entering into this Judgment and agreeing to the terms and conditions provided herein, LPS does not intend to waive and does not waive any defenses, counterclaims, third party claims, privileges or immunities it may have in any other action or proceeding that has been or may be

8

brought against it by any other State, Federal or local governmental agency, or any private litigant or class of litigants, arising from the practices described herein.

### 2.9    Titles or headings

The titles or headings to each section or provision of this Judgment are for convenience purposes only and are not intended by the parties to lend meaning to the actual provisions of this Judgment.

### 2.10    Modification of Terms

No waiver, modification, or amendment of the terms of this Judgment shall be valid or binding unless made in writing, agreed to by both parties, and approved by this Court and then only to the extent specifically set forth in such written waiver, modification, or amendment.

### 2.11    Severability of Terms

If any clause, provision, or section of this Judgment shall, for any reason, be held illegal, invalid, or unenforceable, such illegality, invalidity, or unenforceability shall not affect any other clause, provision, or section of this Judgment, and this Judgment shall be construed and enforced as if such illegal, invalid, or unenforceable clause, section, or other provision had not been contained herein.

### 2.12    Time is of the Essence

Time is of the essence with respect to each provision of this Judgment that requires action to be taken by LPS within a stated time period or upon a specified date or event.

### 2.13   Execution in Counterparts

This Judgment may be executed in any number of counterparts and by different signatories on separate counterparts, each of which shall constitute an original counterpart hereof and all of which together shall constitute one and the same document.  One or more counterparts of this Judgment may be delivered by facsimile or electronic transmission with the intent that it or they shall constitute an original counterpart thereof.

### 2.14   No Acts to Circumvent Terms

LPS shall not participate directly or indirectly in any activity or form a separate entity or corporation for the purpose of engaging in acts or practices in whole or in part that are prohibited by this Judgment or for any other purpose that would otherwise circumvent any part of this Judgment.

### 2.15   More Favorable Terms.

In the event that LPS voluntarily enters into an agreement with the Attorney General of any state that is not participating in this Judgment ("non-participating Attorney General") to resolve potential claims relating to the Covered Conduct in this Judgment on terms that are different than those contained in this Judgment, exclusive of LPS' payment to a non-participating Attorney General of reasonable costs and attorneys' fees incurred by the non-participating Attorney General in civil litigation or criminal investigation that is active and pending as of November 29, 2012, then LPS shall provide a copy of such agreement to each Signatory Attorney General for review. If, after review, the Signatory Attorney General determines those alternative terms are materially more favorable than those contained in this Judgment, then LPS will join the

10

Signatory Attorney General in petitioning the Court to amend this Judgment to reflect any such terms in place of terms herein, without waiving its rights to a judicial determination as to materiality.

## III.   PERMANENT INJUNCTIVE RELIEF AND COMPLIANCE

3.1    LPS, and any person acting under the actual direction or control of LPS, are hereby permanently restrained and enjoined from engaging in acts and practices prohibited by federal, state, or local law.  Further, LPS, and any person acting under the actual direction or control of LPS, are hereby permanently restrained and enjoined from engaging in the following acts and practices and shall comply with the following conduct requirements:

### Document Execution

a.    LPS shall not engage in, or authorize its employees to engage in, Surrogate Signing, as described in Section 2.3 herein.

b.    LPS shall not execute any Attesting Document unless the affiant or signatory has personal knowledge of the accuracy and completeness of the assertions in the Attesting Document.

c.    LPS shall ensure that any Mortgage Loan Document that is executed by LPS on behalf of a Servicer is executed pursuant to proper and verifiable authority to sign on behalf of the Servicer and that assertions contained in the Mortgage Loan Document are supported by competent and reliable evidence.

d.    Any Mortgage Loan Document executed by LPS on behalf of a Servicer shall accurately identify the name of the signatory, the date on which the document is signed, and the authority upon which the signatory is executing the Mortgage Loan

11

Document.  If applicable or permissible, each Mortgage Loan Document shall include the name and address of the entity for which the signatory works.

e.      LPS shall ensure that the affiant or signatory to any Attesting or Mortgage Loan Document shall sign by hand signature, except for permitted electronic filings.

f.      LPS shall not notarize or cause to be notarized any Attesting or Mortgage Loan Document that is signed or attested to outside the presence of the notary.

g.      If LPS provides any notary services or oversees the notarization of any Mortgage Loan Document, LPS shall ensure that the notary procedures comply with all applicable laws governing notarizations, including, but not limited to, ensuring that notaries verify the identity and signature of the putative signatory.  If LPS provides notary services or oversees the notarization of any Mortgage Loan Document, LPS shall ensure that notaries maintain notary logs that identify such Mortgage Loan Documents.

**Law Firms**

h.      LPS shall not improperly interfere with the attorney-client relationship between attorneys and Servicers.

i.      LPS shall not incentivize or promote attorney speed or volume to the detriment of accuracy.

j.      If LPS provides technology or other services that assist law firms or their agents in handling issues relating to processing a foreclosure, bankruptcy, or other legal action, LPS will ensure that its technology and services do not impede, compromise, or otherwise interfere with the activities of a law firm providing legal services to its client.

k.      LPS will ensure that foreclosure and bankruptcy counsel and foreclosure trustees to whom LPS provides services have an appropriate Servicer contact so they may communicate directly with the Servicer.

l.      LPS shall not inhibit or otherwise discourage attorneys and Servicers from direct communication with each other.

m.      LPS shall not negotiate any retainer agreements between the Servicer and its attorney(s) and LPS shall not be a party to such retainer agreements.

n.      For those attorneys who are using LPS' technology services to access information from Servicers, LPS shall take no action to prevent legal counsel from having appropriate access to information from the Servicer's books and records to perform their duties in compliance with applicable laws.

**Incentives**

o.      LPS shall not pay volume-based or other incentives to employees or other agents for the purpose of encouraging undue haste or lack of due diligence to the detriment of accuracy.

**Third-Party Provider Oversight**

p.      LPS shall adopt policies and processes to oversee and manage agents, independent contractors, entities and third parties (including subsidiaries and affiliates) retained by LPS that provide foreclosure, bankruptcy or mortgage-servicing activities relating to default servicing (including loss mitigation) (collectively, such activities are "Servicing Activities" and such providers are "Third-Party Providers"), including the following:

13

(i).    LPS shall perform appropriate due diligence of Third-Party Providers' qualifications, expertise, capacity, reputation, complaints, information security, document custody practices, business continuity, and financial viability.

(ii).    LPS shall ensure that all agreements, engagement letters, or oversight policies with Third-Party Providers comply with LPS' applicable policies and procedures (which will incorporate any applicable aspects of this Judgment) and applicable state and federal laws and rules.

(iii).    LPS shall ensure that agreements, contracts or policies provide for adequate oversight, including measures to enforce Third-Party Provider contractual obligations, and to ensure timely action with respect to Third-Party Provider performance failures.

q.    LPS shall conduct periodic reviews of Third-Party Providers. These reviews shall include the following:

(i).    A review of the fees and costs assessed by the Third-Party Provider to ensure that such fees and costs are within the allowable fees authorized by the Servicers;

(ii).    A review of the Third-Party Provider's processes to provide for compliance with LPS' policies and procedures concerning Servicing Activities;

(iii).    A requirement in its agreements and contracts to require that the Third-Party Provider disclose to LPS any imposition of sanctions or professional disciplinary action taken against them for misconduct related to performance of Servicing Activities.

**Fees**

r.      LPS shall require that all fees charged by Third-Party Providers for default, foreclosure, and bankruptcy-related services performed shall be within the allowable fees authorized by Servicers.

s.      LPS shall be prohibited from collecting any unearned fee, or giving or accepting unlawful referral fees in relation to Third-Party Providers' default- or foreclosure-related services.

t.      Other than reasonable fees charged by LPS to the Servicers for its oversight of Third-Party Providers, LPS shall not impose additional mark-ups or other fees on Third-Party Providers' default- or foreclosure-related services.

u.      LPS' invoices to the Servicers shall label each fee or charge clearly and accurately to denote the specific product or service for which each fee or charge is attributed.

**Escalation of Consumer Complaints**

v.      LPS shall provide to consumers, and ensure that its Third-Party Providers provide to consumers, reasonable notice of dedicated toll-free telephone numbers established and maintained by LPS that consumers can call concerning any issues related to document execution and field services activities (property inspection, preservation, maintenance, and winterization) LPS performs for Servicers.  LPS shall have adequate and competent staff to answer and respond to consumer inquiries promptly, and LPS shall establish a process for dispute escalation and direct contact with a Servicer at a number designated by such Servicer, and methods for tracking the resolution or escalation of complaints.

15

3.2   **Compliance with Attorneys General Agreements with Servicers and other Applicable Laws**

a.      LPS shall be familiar with the settlement terms between the State Attorneys General and any Servicers, including those agreements and judgments already in force, such as the consent judgments entered by United States District Judge Rosemary Collyer of the United States District Court for the District of Columbia in case number 1:12-cv-00361-RMC, *United States et al. v. Bank of America et al*, ("hereinafter referred to as the "National Servicing Settlement") and, upon notification by an Attorney General, any agreements reached or judgments entered subsequent to the entry of this Judgment that affect LPS' acts or practices relating to the Covered Conduct of this Judgment.

b.      LPS shall ensure that any services provided by LPS are consistent with the terms, conditions, and standards imposed by those agreements and judgments as well as with any applicable state or federal law.

c.      LPS will commit appropriate resources to develop technology solutions which will support the National Servicing Settlement standards and guidelines.  LPS will make these technology solutions available to its clients, including, without limitation, the following:

- Protections for Military Personnel under the Service members Civil Relief Act (SCRA);

- Document Integrity Solution that enables Servicers to ensure the accuracy and personal knowledge requirement for the execution of certain Mortgage Related Documents;

16

- Development of a technology process to avoid dual-tracking by enabling a Servicer to define certain steps or critical events to halt a foreclosure process during a loan modification program;
- Processes to enable Servicers to provide a single point of contact; and
- Enhanced loss mitigation processes.

For a two-year period from the Effective Date of this Judgment, LPS will provide a process for the Signatory Attorney General to audit LPS with respect to the development, functionality and implementation timelines for such technology solutions relating to the National Servicing Settlement.  This audit process is in addition to and does not limit LPS' obligations under Section 3.2(e) herein.

d.     LPS agrees to retain documents and other information reasonably sufficient to establish compliance with the provisions of this Judgment; however, nothing in this Judgment requires LPS to retain any specific document or other information for longer than five (5) years.

e.     For a period of five (5) years from the Effective Date, upon a request from the Signatory Attorney General, LPS agrees to provide to the Signatory Attorney General's Office reasonable access to all non-privileged LPS documents and other information without the need for a subpoena or other compulsory process.  The term "non-privileged" means any LPS document or other information not protected by the attorney-client or attorney work product privileges as defined by applicable state law. The term "reasonable access" reflects an understanding by LPS and the Signatory Attorney General's Office that LPS has a legal obligation to protect the privacy of

17

personal identifying information of borrowers and to protect the trade secrets of LPS from public disclosure.  LPS and the Signatory Attorneys General agree to work cooperatively to ensure compliance with these legal obligations.  In the event that LPS concludes that specific information requested is not covered by this provision and cannot be disclosed without a subpoena or other compulsory process, it will notify the Signatory Attorney General within ten (10) days that a subpoena for the information will be required.

This provision is intended to supplement and does not supplant or in any way restrict the Signatory Attorney General's subpoena power and investigative authority under state law.

Subject to the provisions above regarding non-privileged documents and other information, and legal obligations to protect the privacy of personal identifying information and trade secrets from public disclosure, LPS agrees to cooperate with any Signatory Attorney General in its investigation of non-parties related to Covered Conduct.

f.      LPS shall ensure that if it is appointed to act as a trustee or successor trustee, LPS will meet all applicable state requirements to act as a trustee or successor trustee.

g.      LPS shall appoint its Chief Compliance Officer Sheryl L. Newman, or another designee, to act as liaison to the Signatory Attorneys General to receive and respond to inquiries relating to this Judgment.

## IV.   REMEDIATION TO HOMEOWNERS

4.1    LPS agrees to identify Mortgage Loan Documents executed by LPS between January 1, 2008, and December 31, 2010, that may require remediation and to remediate those documents when LPS has the legal authority to do so and when reasonably necessary to assist any person or borrower or when required by state or local laws.  If Mortgage Loan Documents executed by LPS prior to January 1, 2008, require remediation for compliance with applicable laws or when remediation of Mortgage Loan Documents executed by LPS prior to January 1, 2008, is reasonably necessary to assist any person or borrower, LPS shall remediate those documents when LPS has the legal authority to do so.  Notwithstanding LPS' obligations pursuant to this paragraph, its obligations under Section 3.1(v) of this Judgment to address consumer inquiries with respect to document execution are not limited to documents executed between January 1, 2008 and December 31, 2010.  For twelve quarters immediately following entry of this judgment, LPS shall provide each Signatory Attorney General with quarterly reports detailing its efforts to fulfill its obligations under this paragraph.

## V.   MONETARY RELIEF

5.1    LPS shall pay a total of $1,404,186 as settlement payment to the Signatory Attorney General, within 10 (ten) days of the entry of this Judgment, and in accordance with the amounts of payments to each Signatory Attorney General set forth in the attached Exhibit A.  This payment shall be used by the Signatory Attorney General for attorney's fees and other costs of investigation and litigation, placed in or applied to the consumer protection enforcement fund, used to defray costs of the inquiry

leading to this Judgment, or used for any other purposes permitted by state law, at the sole discretion of the Signatory Attorney General.   If any independent review or report by the Federal Banking Agencies determines that a greater number of documents might be affected than what was previously disclosed by Defendants, Defendants agree to notify the Signatory Attorney General within thirty (30) days and increase the payment to the State in accordance with the methodology used to calculate the State payment described in Exhibit A.

5.2    LPS shall pay to the Investigating Attorneys General a total of $7 million in additional attorney's fees and costs to be divided and paid by LPS to each Investigating Attorney General as designated by, and in the sole discretion of, the Investigating Attorneys General.[1]

5.3    Satisfaction of the monetary obligations in this Section V shall not relieve any other obligations under other provisions of this Judgment.

## VI.    RIGHT TO REOPEN

6.1    If, upon motion of the Signatory Attorney General and after hearing by the Court,  the Court finds that LPS failed to pay any amount pursuant to the terms provided by Section V or, subject to the provisions of Section VII of this Judgment, that LPS failed to comply with the provisions in Section II, III, or IV, the Court may enter judgment against LPS in favor of the Signatory Attorney General, in an amount to be determined by the Court, subject to statutory maximum penalties, which shall become immediately due and payable as civil penalties or, upon motion of the Attorney General, as any element of  relief available pursuant to Conn. Gen. Stat. Conn. Gen. Stat.42-110a *et*

---

[1] Payment to the Investigating Attorney General of the State of Connecticut is $483,333.

*seq.* less any amount previously paid.  Should this Judgment be modified as to the monetary liability of Defendant, in all other respects, this Judgment shall remain in full force and effect, unless otherwise ordered by the Court.

6.2     Proceedings to reopen this case instituted under this Section are in addition to, and not in lieu of, any other civil or criminal remedies as may be available by law, including any other proceedings that the Signatory Attorney General may initiate to enforce this Judgment.

## VII.   COMPLIANCE ENFORCEMENT

7.1     The Signatory Attorney General may assert any claim that LPS has violated this Judgment in a separate civil action to enforce compliance with this Judgment or may seek any other relief afforded by law, provided that the Signatory Attorney General gives LPS written notice of the alleged violation and affords LPS thirty (30) days from receipt of the notice to respond to and remedy the violation, or any other period as agreed to by the Signatory Attorney General and LPS.  However, the Attorney General is not required to provide notice in advance of taking any enforcement action within his or her authority that the Attorney General believes is necessary to protect the health or safety of the public.

## VIII.  NOTICES

8.1     All notices under this Judgment shall be sent by overnight U.S. mail to the addresses below:

For the Plaintiff:          Joseph J. Chambers
                            Assistant Attorney General
                            Connecticut Office of the Attorney General
                            P.O. Box 120
                            55 Elm Street
                            Hartford, CT 06141

For the Defendants:      Todd C. Johnson,
                         General Counsel
                         Lender Processing Services, Inc.
                         601 Riverside Avenue
                         Jacksonville, FL 32204


IX.   **RETENTION OF JURISDICTION**

This Court shall retain jurisdiction over this matter for all purposes.


**ORDER**

In accordance with the foregoing Stipulated Judgment, final judgment is hereby

ORDERED this _____ day of _____, 2013.

                         BY THE COURT


                         _____
                                                    , J.


22

With copies to:

Joseph J. Chambers
Assistant Attorney General
Connecticut Office of the Attorney General
P.O. Box 120
55 Elm Street
Hartford, CT 06141

Counsel for State of Connecticut


Robert M. Langer
Wiggin and Dana LLP
One CityPlace
185 Asylum Street
Hartford CT 06103-3402
Telephone: (860) 297-3724
Facsimile: (860) 525-9380
Email:  rlanger@wiggin.com

Counsel for Defendants


Melanie Ann Hines
BERGER SINGERMAN LLP
125 South Gadsden Street
Suite 300
Tallahassee, FL 32301
Telephone: (850) 561-3010
Facsimile: (850) 561-3013

Counsel to Lender Processing Services, Inc.,
LPS Default Solutions, Inc., and DocX, LLC


Bernard Nash
Christopher J. Allen
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, DC  20006-5403
Telephone:  (202) 420-2200
Facsimile:  (202) 420-2201

Counsel to Lender Processing Services, Inc.,
LPS Default Solutions, Inc., and DocX, LLC

23

**Exhibit A:**

| STATE | PAYMENT |
|---|---|
| Alabama | $1,039,780 |
| Alaska | $79,786 |
| Arizona | $3,288,621 |
| Arkansas | $692,496 |
| California | $35,592,284 |
| Connecticut | $1,404,186 |
| District of Columbia | $232,505 |
| Florida | $7,659,176 |
| Georgia | $4,137,490 |
| Hawaii | $401,030 |
| Idaho | $890,995 |
| Illinois | $3,364,326 |
| Indiana | $1,652,280 |
| Iowa | $603,400 |
| Kansas | $581,665 |
| Kentucky | $948,906 |
| Louisiana | $395,801 |
| Maine | $515,725 |
| Maryland | $2,993,130 |
| Massachusetts | $1,539,580 |
| Minnesota | $3,073,140 |
| Mississippi | $507,115 |
| Montana | $410,865 |
| Nebraska | $820,190 |
| New Hampshire | $457,961 |
| New Jersey | $2,904,356 |
| New Mexico | $671,531 |
| New York | $1,883,826 |
| North Carolina | $3,743,306 |
| North Dakota | $219,961 |
| Ohio | $2,544,990 |
| Oklahoma | $930,020 |
| Oregon | $2,513,875 |
| Pennsylvania | $2,890,741 |
| Rhode Island | $447,965 |
| South Carolina | $1,830,640 |
| South Dakota | $344,750 |
| Tennessee | $2,335,746 |
| Texas | $5,755,050 |
| Utah | $1,390,326 |
| Vermont | $371,000 |
| Virginia | $3,558,821 |
| Washington | $4,062,940 |
| West Virginia | $203,595 |
| Wisconsin | $1,505,315 |
| Wyoming | $232,491 |
| **TOTAL** | **$113,623,678** |

Return Date: February 19, 2013

| | | |
|---|---|---|
| STATE OF CONNECTICUT | : | SUPERIOR COURT |
|     *Plaintiff* | : | |
| | : | JUDICIAL DISTRICT OF |
| | : | HARTFORD |
| | : | |
|     v. | : | |
| | : | |
| | : | |
| LENDER PROCESSING SERVICES, INC. | : | |
| a Delaware Corporation; LPS DEFAULT | : | |
| SOLUTIONS, INC., a Delaware Corporation, | : | |
| and DOCX, LLC, a Georgia Limited Liability | : | |
| Company, | : | |
|     *Defendants* | : | JANUARY 31, 2013 |

## **JOINT STIPULATION TO ENTRY OF FINAL JUDGMENT**

It is stipulated between Plaintiff State of Connecticut, represented by Attorney

General George Jepsen, acting at the request of William M. Rubenstein, Commissioner

of the Department of Consumer Protection of the State of Connecticut , and Defendants

Lender Processing Services, Inc., LPS Default Solutions, Inc., and DocX, LLC

(hereinafter collectively referred to as "LPS" or "Defendants") that a Stipulated

Judgment may enter in the form hereinafter set forth, attached hereto, and incorporated

herein, upon motion of any party, without any further notice.

<div style="margin-left:40%">

PLAINTIFF
STATE OF CONNECTICUT

GEORGE JEPSEN
ATTORNEY GENERAL

</div>

DATE: 1/30/13          BY: _____

<div style="margin-left:40%">

Joseph J. Chambers (Juris No. 430258)
Assistant Attorney General

</div>

1

55 Elm Street, P.O. Box 120
Hartford, CT  06141-0120
Telephone: (860) 808-5270
Fascimile:   (860) 808-5385
Email:  joseph.chambers@ct.gov


DEFENDANTS
LENDER PROCESSING SERVICES,
INC., LPS DEFAULT SOLUTIONS,
INC., and DOCX, LLC

DATE: 1/30/13          BY: _____

Robert M. Langer
Wiggin and Dana LLP
One CityPlace
185 Asylum Street
Hartford CT 06103-3402
Telephone: (860) 297-3724
Facsimile: (860) 525-9380
Email:  rlanger@wiggin.com
Juris No. 67700

**CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed, first class postage prepaid, this 31st day of January 2013 to:

Robert M. Langer
Wiggin and Dana LLP
One CityPlace
185 Asylum Street
Hartford CT 06103-3402
Telephone: (860) 297-3724
Facsimile: (860) 525-9380
Email: rlanger@wiggin.com
Juris No. 67700

Joseph J. Chambers
Assistant Attorney General

3

Return Date: February 19, 2013

| | | |
|---|---|---|
| STATE OF CONNECTICUT | : | SUPERIOR COURT |
|     *Plaintiff* | : | |
| | : | JUDICIAL DISTRICT OF |
| | : | HARTFORD |
| | : | |
|     v. | : | |
| | : | |
| | : | |
| LENDER PROCESSING SERVICES, INC. | : | |
| a Delaware Corporation; LPS DEFAULT | : | |
| SOLUTIONS, INC., a Delaware Corporation, | : | |
| and DOCX, LLC, a Georgia Limited Liability | : | |
| Company, | : | |
|     *Defendants* | : | JANUARY 31, 2013 |

## STIPULATED JUDGMENT

      Plaintiff State of Connecticut, represented by Attorney General George Jepsen,

acting at the request of William M. Rubenstein, Commissioner of the Department of

Consumer Protection of the State of Connecticut, and Defendants Lender Processing

Services, Inc., LPS Default Solutions, Inc., and DocX, LLC (hereinafter collectively

referred to as "LPS" or "Defendants"), have filed a written Stipulation, filed herewith, that

judgment be entered as set forth herein.  Therefore, upon consideration of the papers

filed and consent of the parties hereto, it is hereby ORDERED and ADJUDGED as

follows:

## I.    JURISDICTION

      This Court has jurisdiction over the subject matter of this action and the parties

hereto.  This same day, Plaintiff has filed a Complaint for Injunctive and Other Statutory

Relief (the "Complaint") against LPS pursuant to the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. Conn. Gen. Stat.42-110a *et seq.*

## II.   GENERAL PROVISIONS

### 2.1   Agreement

The State and LPS are represented by counsel and have agreed on a basis for settlement of the matters alleged in the Complaint. The parties agree to entry of this Stipulated Judgment (hereinafter "Judgment") without the need for trial, discovery in this action, or adjudication of any issue of law or fact.  Defendants enter into this Judgment freely and without coercion, and without admitting any violation of the law.  Defendants acknowledge that they are able to abide by the provisions of this Judgment. Defendants further acknowledge that a violation of this Judgment may result in additional relief pursuant to Conn. Gen. Stat.42-110a *et seq.*

### 2.2   Definitions

a.     "**Attesting Documents**" shall mean affidavits and similar sworn statements making various assertions relating to a mortgage loan, such as the ownership of the mortgage note and mortgage or deed of trust, the amount of principal and interest due, and the fees and expenses chargeable to the borrower.

b.     "**Covered Conduct**" shall mean LPS' practices related to mortgage default servicing, including document creation, preparation, execution, recordation, and notarization practices as they relate to Mortgage Loan Documents as well as LPS' relationships with attorneys representing the Servicers and other third parties through the Effective Date of this Judgment.

c.    "**Effective Date**" shall mean the date on which a copy of this Judgment, duly executed by Defendants and by the Signatory Attorney General, is approved by and becomes a Judgment of the Court.

d.    "**Federal Banking Agencies**" shall mean the Board of Governors of the Federal Reserve System, The Federal Deposit Insurance Corporation, The Office of the Comptroller of the Currency, and the Office of Thrift Supervision.

e.    "**Investigating Attorneys General**" shall mean the Attorneys General of the States of Arizona, California, Connecticut, Florida, Illinois, Iowa, Oregon, New Jersey, North Carolina, Pennsylvania, South Carolina, Texas, and Washington.

f.    "**LPS**" shall mean Defendants Lender Processing Services, Inc.; LPS Default Solutions, Inc.; and DocX, LLC, including all of their parents, subsidiaries, and divisions.

g.    "**Mortgage Loan Documents**" shall mean (i) Attesting Documents; (ii) assignments of mortgages or deeds of trust or notes; (iii) mortgage or deed of trust lien releases and satisfactions; (iv) notices of trustee sale; (v) notices of breach or default; and (vi) other mortgage-related documents that are required for statutory, non-judicial foreclosure or foreclosure-related documents filed with a state court or in connection with a federal bankruptcy proceeding.

h.    "**Parties**" shall mean LPS, the State, and the Signatory Attorney General.

i.    "**Servicer**" shall mean any residential mortgage loan servicing entity to which LPS provides technology and/or other services relating to mortgages in default.

j.    "**Signatory Attorney General**" shall mean Attorney General George Jepsen, or his authorized designee, who has agreed to this Judgment.

3

2.3   **Stipulated Facts**

The Investigating Attorneys General conducted investigations regarding certain business practices relating to the Covered Conduct.  The Investigating Attorneys General found and the Defendants stipulate to the following facts of the investigation:

a.      During a period from at least January 1, 2008, to December 31, 2010, certain Servicers authorized specific persons employed by certain subsidiaries of Lender Processing Services, Inc., to sign Mortgage Loan Documents or assist with the execution of Mortgage Loan Documents on their behalf.

b.      Some Mortgage Loan Documents generated and/or executed by certain subsidiaries of Lender Processing Services, Inc., on behalf of Servicers contain defects including, but not limited to, unauthorized signatures, improper notarizations, or attestations of facts not personally known to or verified by the affiant.  Some of these Mortgage Loan Documents may contain unauthorized signatures or may contain inaccurate information relating to the identity, location, or legal authority of the signatory, assignee, or beneficiary or to the effective date of the assignment.

c.      Certain subsidiaries of Lender Processing Services, Inc., recorded or caused to be recorded Mortgage Loan Documents with these defects in local land records offices or executed or facilitated execution on behalf of the Servicers knowing some of these Mortgage Loan Documents would be filed in state courts or used to comply with statutory, non-judicial foreclosure processes.

d.      At some time prior to November 1, 2009, employees and agents of DocX, LLC ("DocX") a wholly owned, indirect subsidiary of Lender Processing Services, Inc., were directed by management of DocX to initiate and implement a program under which

4

some DocX employees signed Mortgage Loan Documents in the name of other DocX employees, who were or had been at one time authorized to sign on behalf of Servicers. DocX referred to these unauthorized signers as "Surrogate Signers."

e.      At the time the Surrogate Signers signed certain Mortgage Loan Documents, they were not authorized by the applicable Servicer to sign their own names or the names of those persons who had purportedly been authorized by the Servicer to sign the Mortgage Loan Documents in question.

f.      The Surrogate Signers executed certain Mortgage Loan Documents in the name of other DocX employees without indicating that the documents had been signed by a Surrogate Signer.

g.      Notaries public employed by DocX or as agents of DocX completed the notarial statements on the Mortgage Loan Documents that were executed by Surrogate Signers and stated that those documents had been properly acknowledged, signed, and affirmed in their presence by the person whose name appeared on the document when in fact the Surrogate Signer had signed the name of another person or signed outside the presence of the notary, or both.

h.      DocX presented and recorded certain Mortgage Loan Documents with local land records offices knowing they had been executed by Surrogate Signers.

i.      On or around November 2009, Lender Processing Services, Inc., conducted an internal review of DocX and identified certain Mortgage Loan Documents that contained inaccuracies, unauthorized signatures, notarization defects, or other deficiencies. Lender Processing Services, Inc., has also identified certain other defects and deficiencies in the Mortgage Loan Documents executed by some of its other

subsidiaries.  Such past practices, when discovered by Lender Processing Services, Inc., management, were discontinued.

j.      On April 13, 2011, LPS entered into a Consent Order with Federal Banking Agencies, which order contains similar allegations of deficiencies in Mortgage Loan Document execution practices at certain subsidiaries of LPS and management oversight of these practices.  Pursuant to the Consent Order, LPS has agreed to take further remedial action, including, but not limited to, proposing a plan to enhance internal auditing and risk management, adopting a comprehensive compliance program for activities relating to default management services, and retaining an independent consultant to conduct an independent review of LPS' document execution services occurring between January 1, 2008, and December 31, 2010, to determine the existence and extent of the deficiencies and to assess LPS' ability to identify affected Mortgage Loan Documents, to remediate the deficiencies, as appropriate, and to assess whether any financial injury to Servicers or borrowers resulted from the document execution services described herein. To the extent the independent consultant identifies any such financial harm, LPS has agreed to prepare a remediation plan under the Consent Order that will, as appropriate, address reimbursement to those borrowers for any such financial injury.

2.4      **Preservation of Law Enforcement Action**

Nothing herein precludes the Signatory Attorney General from enforcing the provisions of this Judgment, or from pursuing any law enforcement action with respect to the acts or practices of Defendants not covered by this Judgment or any acts or practices of Defendants conducted after the entry of this Judgment. The fact that such

conduct is not expressly prohibited by the terms of this Judgment shall not be a defense to any such enforcement action.

2.5   **Compliance with State and Federal Law**

Nothing herein relieves Defendants of their duty to comply with applicable laws of the State and all federal or local laws, regulations, ordinances, and codes, nor constitutes authorization by the Signatory Attorney General for the Defendants to engage in acts or practices prohibited by such laws.  If, subsequent to the Effective Date of this Judgment, any state, local, or federal law is enacted or regulation promulgated with respect to the Covered Conduct of this Judgment and Defendants intend to comply with the newly enacted legislation or regulation and that compliance may create a conflict with the terms of this Judgment, Defendants shall notify the Signatory Attorney General of this intent.  If the Attorney General agrees, the Attorney General shall consent to a modification for the purpose of eliminating the conflict.  The Attorney General agrees that consent to modify is appropriate if any conduct prohibited by this Judgment is required by State, local, or federal law or regulation, or if conduct required by this Judgment is prohibited by such State, local, or federal law or regulation. The Attorney General will give each request to modify based on a change in the applicable law reasonable consideration and will respond to the Defendant(s) within 90 days.  Nothing herein is intended to preclude Defendants from seeking modification of this Judgment if the Attorney General does not consent to the request of the Defendant(s).

7

### 2.6   **Non-Approval of Conduct**

Nothing herein constitutes approval by the Signatory Attorney General of LPS' past or future practices.  LPS shall not make any representation to the contrary.

### 2.7   **Release**

The Signatory Attorney General hereby releases and discharges LPS and each and all current and former officers, shareholders, and employees from civil or administrative claims that his or her State has or may have had against them under Conn. Gen. Stat. Conn. Gen. Stat.42-110a *et seq.,* including claims for damages, fines, injunctive relief, remedies, sanctions, or penalties resulting from the Covered Conduct on or before the Effective Date (collectively, the "Released Claims").  Nothing herein shall be construed as a waiver or release of any private rights, causes of action, or remedies of any person against the Defendants with respect to the Covered Conduct.

### 2.8   **Evidentiary Effect of this Judgment**

This Judgment is not and shall not in any event be construed, deemed to be, and/or used as an admission or evidence of the validity of any claim that the Signatory Attorney General has or could assert against LPS, or an admission of any alleged wrongdoing or liability by LPS in any civil, criminal, or administrative court, administrative agency, or other tribunal anywhere in the country.  The agreement of LPS to comply with the provisions of this Judgment is not an admission that LPS ever engaged in any activity contrary to any law.  Moreover, by entering into this Judgment and agreeing to the terms and conditions provided herein, LPS does not intend to waive and does not waive any defenses, counterclaims, third party claims, privileges or immunities it may have in any other action or proceeding that has been or may be

8

brought against it by any other State, Federal or local governmental agency, or any private litigant or class of litigants, arising from the practices described herein.

### 2.9    Titles or headings

The titles or headings to each section or provision of this Judgment are for convenience purposes only and are not intended by the parties to lend meaning to the actual provisions of this Judgment.

### 2.10    Modification of Terms

No waiver, modification, or amendment of the terms of this Judgment shall be valid or binding unless made in writing, agreed to by both parties, and approved by this Court and then only to the extent specifically set forth in such written waiver, modification, or amendment.

### 2.11    Severability of Terms

If any clause, provision, or section of this Judgment shall, for any reason, be held illegal, invalid, or unenforceable, such illegality, invalidity, or unenforceability shall not affect any other clause, provision, or section of this Judgment, and this Judgment shall be construed and enforced as if such illegal, invalid, or unenforceable clause, section, or other provision had not been contained herein.

### 2.12    Time is of the Essence

Time is of the essence with respect to each provision of this Judgment that requires action to be taken by LPS within a stated time period or upon a specified date or event.

2.13   **Execution in Counterparts**

This Judgment may be executed in any number of counterparts and by different signatories on separate counterparts, each of which shall constitute an original counterpart hereof and all of which together shall constitute one and the same document.  One or more counterparts of this Judgment may be delivered by facsimile or electronic transmission with the intent that it or they shall constitute an original counterpart thereof.

2.14   **No Acts to Circumvent Terms**

LPS shall not participate directly or indirectly in any activity or form a separate entity or corporation for the purpose of engaging in acts or practices in whole or in part that are prohibited by this Judgment or for any other purpose that would otherwise circumvent any part of this Judgment.

2.15   **More Favorable Terms.**

In the event that LPS voluntarily enters into an agreement with the Attorney General of any state that is not participating in this Judgment ("non-participating Attorney General") to resolve potential claims relating to the Covered Conduct in this Judgment on terms that are different than those contained in this Judgment, exclusive of LPS' payment to a non-participating Attorney General of reasonable costs and attorneys' fees incurred by the non-participating Attorney General in civil litigation or criminal investigation that is active and pending as of November 29, 2012, then LPS shall provide a copy of such agreement to each Signatory Attorney General for review. If, after review, the Signatory Attorney General determines those alternative terms are materially more favorable than those contained in this Judgment, then LPS will join the

10

Signatory Attorney General in petitioning the Court to amend this Judgment to reflect any such terms in place of terms herein, without waiving its rights to a judicial determination as to materiality.

## III.   PERMANENT INJUNCTIVE RELIEF AND COMPLIANCE

3.1     LPS, and any person acting under the actual direction or control of LPS, are hereby permanently restrained and enjoined from engaging in acts and practices prohibited by federal, state, or local law.  Further, LPS, and any person acting under the actual direction or control of LPS, are hereby permanently restrained and enjoined from engaging in the following acts and practices and shall comply with the following conduct requirements:

### Document Execution

a.     LPS shall not engage in, or authorize its employees to engage in, Surrogate Signing, as described in Section 2.3 herein.

b.     LPS shall not execute any Attesting Document unless the affiant or signatory has personal knowledge of the accuracy and completeness of the assertions in the Attesting Document.

c.     LPS shall ensure that any Mortgage Loan Document that is executed by LPS on behalf of a Servicer is executed pursuant to proper and verifiable authority to sign on behalf of the Servicer and that assertions contained in the Mortgage Loan Document are supported by competent and reliable evidence.

d.     Any Mortgage Loan Document executed by LPS on behalf of a Servicer shall accurately identify the name of the signatory, the date on which the document is signed, and the authority upon which the signatory is executing the Mortgage Loan

Document.  If applicable or permissible, each Mortgage Loan Document shall include the name and address of the entity for which the signatory works.

     e.     LPS shall ensure that the affiant or signatory to any Attesting or Mortgage Loan Document shall sign by hand signature, except for permitted electronic filings.

     f.     LPS shall not notarize or cause to be notarized any Attesting or Mortgage Loan Document that is signed or attested to outside the presence of the notary.

     g.     If LPS provides any notary services or oversees the notarization of any Mortgage Loan Document, LPS shall ensure that the notary procedures comply with all applicable laws governing notarizations, including, but not limited to, ensuring that notaries verify the identity and signature of the putative signatory.  If LPS provides notary services or oversees the notarization of any Mortgage Loan Document, LPS shall ensure that notaries maintain notary logs that identify such Mortgage Loan Documents.

**Law Firms**

     h.     LPS shall not improperly interfere with the attorney-client relationship between attorneys and Servicers.

     i.     LPS shall not incentivize or promote attorney speed or volume to the detriment of accuracy.

     j.     If LPS provides technology or other services that assist law firms or their agents in handling issues relating to processing a foreclosure, bankruptcy, or other legal action, LPS will ensure that its technology and services do not impede, compromise, or otherwise interfere with the activities of a law firm providing legal services to its client.

k.      LPS will ensure that foreclosure and bankruptcy counsel and foreclosure trustees to whom LPS provides services have an appropriate Servicer contact so they may communicate directly with the Servicer.

l.      LPS shall not inhibit or otherwise discourage attorneys and Servicers from direct communication with each other.

m.      LPS shall not negotiate any retainer agreements between the Servicer and its attorney(s) and LPS shall not be a party to such retainer agreements.

n.      For those attorneys who are using LPS' technology services to access information from Servicers, LPS shall take no action to prevent legal counsel from having appropriate access to information from the Servicer's books and records to perform their duties in compliance with applicable laws.

**Incentives**

o.      LPS shall not pay volume-based or other incentives to employees or other agents for the purpose of encouraging undue haste or lack of due diligence to the detriment of accuracy.

**Third-Party Provider Oversight**

p.      LPS shall adopt policies and processes to oversee and manage agents, independent contractors, entities and third parties (including subsidiaries and affiliates) retained by LPS that provide foreclosure, bankruptcy or mortgage-servicing activities relating to default servicing (including loss mitigation) (collectively, such activities are "Servicing Activities" and such providers are "Third-Party Providers"), including the following:

13

(i).    LPS shall perform appropriate due diligence of Third-Party Providers' qualifications, expertise, capacity, reputation, complaints, information security, document custody practices, business continuity, and financial viability.

(ii).    LPS shall ensure that all agreements, engagement letters, or oversight policies with Third-Party Providers comply with LPS' applicable policies and procedures (which will incorporate any applicable aspects of this Judgment) and applicable state and federal laws and rules.

(iii).    LPS shall ensure that agreements, contracts or policies provide for adequate oversight, including measures to enforce Third-Party Provider contractual obligations, and to ensure timely action with respect to Third-Party Provider performance failures.

q.    LPS shall conduct periodic reviews of Third-Party Providers. These reviews shall include the following:

(i).    A review of the fees and costs assessed by the Third-Party Provider to ensure that such fees and costs are within the allowable fees authorized by the Servicers;

(ii).    A review of the Third-Party Provider's processes to provide for compliance with LPS' policies and procedures concerning Servicing Activities;

(iii).    A requirement in its agreements and contracts to require that the Third-Party Provider disclose to LPS any imposition of sanctions or professional disciplinary action taken against them for misconduct related to performance of Servicing Activities.

14

**Fees**

r.      LPS shall require that all fees charged by Third-Party Providers for default, foreclosure, and bankruptcy-related services performed shall be within the allowable fees authorized by Servicers.

s.      LPS shall be prohibited from collecting any unearned fee, or giving or accepting unlawful referral fees in relation to Third-Party Providers' default- or foreclosure-related services.

t.      Other than reasonable fees charged by LPS to the Servicers for its oversight of Third-Party Providers, LPS shall not impose additional mark-ups or other fees on Third-Party Providers' default- or foreclosure-related services.

u.      LPS' invoices to the Servicers shall label each fee or charge clearly and accurately to denote the specific product or service for which each fee or charge is attributed.

**Escalation of Consumer Complaints**

v.      LPS shall provide to consumers, and ensure that its Third-Party Providers provide to consumers, reasonable notice of dedicated toll-free telephone numbers established and maintained by LPS that consumers can call concerning any issues related to document execution and field services activities (property inspection, preservation, maintenance, and winterization) LPS performs for Servicers.  LPS shall have adequate and competent staff to answer and respond to consumer inquiries promptly, and LPS shall establish a process for dispute escalation and direct contact with a Servicer at a number designated by such Servicer, and methods for tracking the resolution or escalation of complaints.

3.2   **Compliance with Attorneys General Agreements with Servicers and other Applicable Laws**

a.     LPS shall be familiar with the settlement terms between the State Attorneys General and any Servicers, including those agreements and judgments already in force, such as the consent judgments entered by United States District Judge Rosemary Collyer of the United States District Court for the District of Columbia in case number 1:12-cv-00361-RMC, *United States et al. v. Bank of America et al*, ("hereinafter referred to as the "National Servicing Settlement") and, upon notification by an Attorney General, any agreements reached or judgments entered subsequent to the entry of this Judgment that affect LPS' acts or practices relating to the Covered Conduct of this Judgment.

b.     LPS shall ensure that any services provided by LPS are consistent with the terms, conditions, and standards imposed by those agreements and judgments as well as with any applicable state or federal law.

c.     LPS will commit appropriate resources to develop technology solutions which will support the National Servicing Settlement standards and guidelines.  LPS will make these technology solutions available to its clients, including, without limitation, the following:

- Protections for Military Personnel under the Service members Civil Relief Act (SCRA);
- Document Integrity Solution that enables Servicers to ensure the accuracy and personal knowledge requirement for the execution of certain Mortgage Related Documents;

16

- Development of a technology process to avoid dual-tracking by enabling a Servicer to define certain steps or critical events to halt a foreclosure process during a loan modification program;
- Processes to enable Servicers to provide a single point of contact; and
- Enhanced loss mitigation processes.

For a two-year period from the Effective Date of this Judgment, LPS will provide a process for the Signatory Attorney General to audit LPS with respect to the development, functionality and implementation timelines for such technology solutions relating to the National Servicing Settlement.  This audit process is in addition to and does not limit LPS' obligations under Section 3.2(e) herein.

d.     LPS agrees to retain documents and other information reasonably sufficient to establish compliance with the provisions of this Judgment; however, nothing in this Judgment requires LPS to retain any specific document or other information for longer than five (5) years.

e.     For a period of five (5) years from the Effective Date, upon a request from the Signatory Attorney General, LPS agrees to provide to the Signatory Attorney General's Office reasonable access to all non-privileged LPS documents and other information without the need for a subpoena or other compulsory process.  The term "non-privileged" means any LPS document or other information not protected by the attorney-client or attorney work product privileges as defined by applicable state law. The term "reasonable access" reflects an understanding by LPS and the Signatory Attorney General's Office that LPS has a legal obligation to protect the privacy of

17

personal identifying information of borrowers and to protect the trade secrets of LPS from public disclosure.  LPS and the Signatory Attorneys General agree to work cooperatively to ensure compliance with these legal obligations.  In the event that LPS concludes that specific information requested is not covered by this provision and cannot be disclosed without a subpoena or other compulsory process, it will notify the Signatory Attorney General within ten (10) days that a subpoena for the information will be required.

This provision is intended to supplement and does not supplant or in any way restrict the Signatory Attorney General's subpoena power and investigative authority under state law.

Subject to the provisions above regarding non-privileged documents and other information, and legal obligations to protect the privacy of personal identifying information and trade secrets from public disclosure, LPS agrees to cooperate with any Signatory Attorney General in its investigation of non-parties related to Covered Conduct.

f.   LPS shall ensure that if it is appointed to act as a trustee or successor trustee, LPS will meet all applicable state requirements to act as a trustee or successor trustee.

g.   LPS shall appoint its Chief Compliance Officer Sheryl L. Newman, or another designee, to act as liaison to the Signatory Attorneys General to receive and respond to inquiries relating to this Judgment.

18

## IV.   **REMEDIATION TO HOMEOWNERS**

4.1    LPS agrees to identify Mortgage Loan Documents executed by LPS between January 1, 2008, and December 31, 2010, that may require remediation and to remediate those documents when LPS has the legal authority to do so and when reasonably necessary to assist any person or borrower or when required by state or local laws.  If Mortgage Loan Documents executed by LPS prior to January 1, 2008, require remediation for compliance with applicable laws or when remediation of Mortgage Loan Documents executed by LPS prior to January 1, 2008, is reasonably necessary to assist any person or borrower, LPS shall remediate those documents when LPS has the legal authority to do so.  Notwithstanding LPS' obligations pursuant to this paragraph, its obligations under Section 3.1(v) of this Judgment to address consumer inquiries with respect to document execution are not limited to documents executed between January 1, 2008 and December 31, 2010.  For twelve quarters immediately following entry of this judgment, LPS shall provide each Signatory Attorney General with quarterly reports detailing its efforts to fulfill its obligations under this paragraph.

## V.   **MONETARY RELIEF**

5.1    LPS shall pay a total of $1,404,186 as settlement payment to the Signatory Attorney General, within 10 (ten) days of the entry of this Judgment, and in accordance with the amounts of payments to each Signatory Attorney General set forth in the attached Exhibit A.  This payment shall be used by the Signatory Attorney General for attorney's fees and other costs of investigation and litigation, placed in or applied to the consumer protection enforcement fund, used to defray costs of the inquiry

leading to this Judgment, or used for any other purposes permitted by state law, at the sole discretion of the Signatory Attorney General.   If any independent review or report by the Federal Banking Agencies determines that a greater number of documents might be affected than what was previously disclosed by Defendants, Defendants agree to notify the Signatory Attorney General within thirty (30) days and increase the payment to the State in accordance with the methodology used to calculate the State payment described in Exhibit A.

5.2    LPS shall pay to the Investigating Attorneys General a total of $7 million in additional attorney's fees and costs to be divided and paid by LPS to each Investigating Attorney General as designated by, and in the sole discretion of, the Investigating Attorneys General.[1]

5.3    Satisfaction of the monetary obligations in this Section V shall not relieve any other obligations under other provisions of this Judgment.

## VI.    RIGHT TO REOPEN

6.1    If, upon motion of the Signatory Attorney General and after hearing by the Court,  the Court finds that LPS failed to pay any amount pursuant to the terms provided by Section V or, subject to the provisions of Section VII of this Judgment, that LPS failed to comply with the provisions in Section II, III, or IV, the Court may enter judgment against LPS in favor of the Signatory Attorney General, in an amount to be determined by the Court, subject to statutory maximum penalties, which shall become immediately due and payable as civil penalties or, upon motion of the Attorney General, as any element of  relief available pursuant to Conn. Gen. Stat. Conn. Gen. Stat.42-110a *et*

---

[1] Payment to the Investigating Attorney General of the State of Connecticut is $483,333.

20

*seq.* less any amount previously paid.  Should this Judgment be modified as to the monetary liability of Defendant, in all other respects, this Judgment shall remain in full force and effect, unless otherwise ordered by the Court.

6.2    Proceedings to reopen this case instituted under this Section are in addition to, and not in lieu of, any other civil or criminal remedies as may be available by law, including any other proceedings that the Signatory Attorney General may initiate to enforce this Judgment.

## VII.    COMPLIANCE ENFORCEMENT

7.1    The Signatory Attorney General may assert any claim that LPS has violated this Judgment in a separate civil action to enforce compliance with this Judgment or may seek any other relief afforded by law, provided that the Signatory Attorney General gives LPS written notice of the alleged violation and affords LPS thirty (30) days from receipt of the notice to respond to and remedy the violation, or any other period as agreed to by the Signatory Attorney General and LPS.  However, the Attorney General is not required to provide notice in advance of taking any enforcement action within his or her authority that the Attorney General believes is necessary to protect the health or safety of the public.

## VIII.    NOTICES

8.1    All notices under this Judgment shall be sent by overnight U.S. mail to the addresses below:

For the Plaintiff:              Joseph J. Chambers
                               Assistant Attorney General
                               Connecticut Office of the Attorney General
                               P.O. Box 120
                               55 Elm Street
                               Hartford, CT 06141

For the Defendants:      Todd C. Johnson,
                              General Counsel
                              Lender Processing Services, Inc.
                              601 Riverside Avenue
                              Jacksonville, FL 32204

## IX.    RETENTION OF JURISDICTION

This Court shall retain jurisdiction over this matter for all purposes.

## ORDER

In accordance with the foregoing Stipulated Judgment, final judgment is hereby ORDERED this _____ day of _____, 2013.

BY THE COURT

_____
                                    , J.

22

With copies to:

    Joseph J. Chambers
    Assistant Attorney General
    Connecticut Office of the Attorney General
    P.O. Box 120
    55 Elm Street
    Hartford, CT 06141

    Counsel for State of Connecticut


    Robert M. Langer
    Wiggin and Dana LLP
    One CityPlace
    185 Asylum Street
    Hartford CT 06103-3402
    Telephone: (860) 297-3724
    Facsimile: (860) 525-9380
    Email:  rlanger@wiggin.com

    Counsel for Defendants


    Melanie Ann Hines
    BERGER SINGERMAN LLP
    125 South Gadsden Street
    Suite 300
    Tallahassee, FL 32301
    Telephone: (850) 561-3010
    Facsimile: (850) 561-3013

    Counsel to Lender Processing Services, Inc.,
    LPS Default Solutions, Inc., and DocX, LLC


    Bernard Nash
    Christopher J. Allen
    DICKSTEIN SHAPIRO LLP
    1825 Eye Street, N.W.
    Washington, DC  20006-5403
    Telephone:  (202) 420-2200
    Facsimile:  (202) 420-2201

    Counsel to Lender Processing Services, Inc.,
    LPS Default Solutions, Inc., and DocX, LLC

<center>23</center>

**Exhibit A:**

| STATE | PAYMENT |
|---|---|
| Alabama | $1,039,780 |
| Alaska | $79,786 |
| Arizona | $3,288,621 |
| Arkansas | $692,496 |
| California | $35,592,284 |
| Connecticut | $1,404,186 |
| District of Columbia | $232,505 |
| Florida | $7,659,176 |
| Georgia | $4,137,490 |
| Hawaii | $401,030 |
| Idaho | $890,995 |
| Illinois | $3,364,326 |
| Indiana | $1,652,280 |
| Iowa | $603,400 |
| Kansas | $581,665 |
| Kentucky | $948,906 |
| Louisiana | $395,801 |
| Maine | $515,725 |
| Maryland | $2,993,130 |
| Massachusetts | $1,539,580 |
| Minnesota | $3,073,140 |
| Mississippi | $507,115 |
| Montana | $410,865 |
| Nebraska | $820,190 |
| New Hampshire | $457,961 |
| New Jersey | $2,904,356 |
| New Mexico | $671,531 |
| New York | $1,883,826 |
| North Carolina | $3,743,306 |
| North Dakota | $219,961 |
| Ohio | $2,544,990 |
| Oklahoma | $930,020 |
| Oregon | $2,513,875 |
| Pennsylvania | $2,890,741 |
| Rhode Island | $447,965 |
| South Carolina | $1,830,640 |
| South Dakota | $344,750 |
| Tennessee | $2,335,746 |
| Texas | $5,755,050 |
| Utah | $1,390,326 |
| Vermont | $371,000 |
| Virginia | $3,558,821 |
| Washington | $4,062,940 |
| West Virginia | $203,595 |
| Wisconsin | $1,505,315 |
| Wyoming | $232,491 |
| **TOTAL** | **$113,623,678** |

24